[Civ. No. 25053. Second Dist., Div. One. July 24, 1961.]

MILDRED BEACH, Appellant, v. GLADYS G.
ARBLASTER, as Executrix, etc., Respondent.

Morris Lavine and Roy B. Woolsey for Appellant.

Gibson, Dunn & Crutcher, Sherman Welpton, Jr., and Robert S. Warren for Respondent.

FOURT, J.—This is an appeal from a summary judgment and from an order denying a motion for reconsideration of the order granting the summary judgment and denying a motion for leave to file an amended complaint.

A résumé of some of the events as set forth in the pleadings, statements and declarations in the case, is as follows: On February 11, 1960, plaintiff, an unmarried woman, filed a "COMPLAINT FOR DAMAGES (Fraud and Estoppel)" against "Gladys G. Arblaster, Executrix of the Last Will and Testament of William E. Arblaster, also known as W. E. Arblaster, Deceased." It was therein alleged that William E. Arblaster (hereinafter referred to as "deceased"), died on or about August 12, 1959; that his will dated March 19, 1929, was admitted to probate, and that Gladys G. Arblaster (wife of deceased) was appointed executrix. Plaintiff asserted that during January 1955 and prior thereto, the deceased "proposed to plaintiff that he and plaintiff marry, and he orally represented, warranted and promised that he would marry plaintiff. Said proposal was then and there accepted by plaintiff"; that from January 1955 to August 1959, deceased repeated his promise and representation and that deceased "represented, warranted and promised that he had provided well for her and if anything happened to him she was and would be well provided for, meaning and representing thereby that, in the event of his death, she was and would be well provided for by him by will and otherwise." Further it was alleged that plaintiff believed and relied upon the aforesaid representations and that she "in reliance thereon and at his special instance and request gave to him companionship, comfort, society, all her love and affection, attention, rendered services to him, was ready, willing and able to marry him, refrained from encouraging and making other friendships, companionships and acquaintanceships, remained unmarried, and during or about 1955 gave up her career in television producing, writing and acting, has lost her contacts, connections and skill pertaining thereto which she had established by hard work during a period of over five years." She also alleged on information and belief that deceased made the above representations "fraudulently without any intention on his part of performing or carrying out the same, for the purpose of inducing plaintiff" to pursue the course of conduct allegedly pursued. She then alleged that she did not discover that deceased did not intend to marry her and that

he did not provide for her until August 12, 1959 (i.e. date of deceased's death).

She asserted that by reason of the above, she sustained damages in the sum of $425,000. Upon information and belief, it was also alleged that deceased made the representations "in a heartless way with malice . . . and the foregoing damages should be awarded to plaintiff, in addition to the foregoing reasons, for the sake of example." Lastly, plaintiff alleged that on January 7, 1960, she presented a claim for damages to the executrix and thereafter on January 15, 1960, filed a claim in the matter of the estate of William E. Arblaster; that more than 10 days elapsed since the presentation and filing of the claim and that the executrix orally rejected the claim.

On February 29, 1960, defendant's "ANSWER TO COMPLAINT" was filed. The answer denied all of the charging allegations of the complaint, and also raised five separate and distinct affirmative defenses.[1]

On May 6, 1960, defendant filed a "NOTICE OF MOTION FOR SUMMARY JUDGMENT" along with affidavits (statements)

---

[1] "FIRST SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE

"III

"The Complaint and each and every purported cause of action therein contained are barred by the provisions of Subdivisions 1, 3 and 6 of § 1624 of the California Civil Code.

"SECOND SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE

"IV

"The Complaint and each and every purported cause of action therein contained are barred by the provisions of § 43.4 of the California Civil Code.

"THIRD SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE

"V

"The Complaint and each and every purported cause of action therein contained are barred by the provisions of § 1667 of the California Civil Code.

"FOURTH SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE

"VI

"At all times mentioned in the Complaint plaintiff actually knew, or should have known, that said William E. Arblaster was then and there married and that there were no divorce proceedings of any nature or kind pending, and plaintiff's Complaint and each and every purported cause of action therein contained are contrary to the public policy of the State of California and therefore barred.

"FIFTH SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE

"VII

"By reason of the foregoing facts plaintiff is barred by her laches and is estopped to assert each and all of the claims set forth in the Complaint herein."

of Gladys G. Arblaster and George L. Roberts and a memorandum of Points and Authorities.

The affidavit of Gladys G. Arblaster provided in effect that she and deceased married "on July 19, 1919, which said marriage was continuous up until the date of his death on August 12, 1959"; that they continuously resided together until the date of his death; that they never lived separate and apart from each other and that neither of them had ever sought to obtain a divorce nor separated or discussed obtaining a divorce; defendant stated "Throughout our entire married life my husband and I never had discussed a property settlement agreement nor entered into one, rather most of our assets and securities were acquired and held in joint tenancy."

The affidavit or statement of George L. Roberts provided in substance that he had known deceased "from 1929 until his death in August, 1959"; that he had never heard or known of deceased's being separated from his wife; he stated "I first introduced William E. Arblaster to Mrs. Mildred Matter Beach in or about 1952. At the time of said introduction . . . *I stated and advised her at the time she first met William E. Arblaster that the latter was a married man.*"[2] (Emphasis added.)

A number of affidavits (i.e. declarations) in opposition to the motion for summary judgment were filed.

The declaration of Marjorie Peterson, filed May 24, 1960, set forth in effect that she had met deceased during December of 1951; that about that time she had moved into an apartment near an apartment occupied by plaintiff and continued to occupy said apartment as plaintiff occupied her apartment for a period in excess of two years thereafter. She further set forth that during this two-year period she saw deceased at least once each week and generally several times each week except for a period of less than two months during said two years; that when she was at plaintiff's apartment as she often was during the two-year period, deceased called on the phone and he often called several times in one day and further that she saw deceased frequently during said two-year period and occasionally thereafter during each year through 1958. She stated that on most of the occasions when

---

[2]The minute order of May 18, 1960, discloses a stipulation "*that plaintiff knew as early as 1954 that William E. Arblaster was a married man.*" (Emphasis added.)

she was at plaintiff's apartment during the entire period from December 1951 through 1958, deceased was there; that deceased was always affectionate and very attentive; that plaintiff and deceased seemed very much in love and very close together and at many times in 1952 and each year through 1958, deceased stated that he and plaintiff were going to be married; that deceased never stated that he was married or mentioned his marital status. (Note: see footnote No. 2.) She also asserted that approximately seven years ago, at a time when plaintiff was on a trip in the East, deceased came to declarant's apartment and told her that plaintiff would be returning soon, that he missed her, and that they were going to marry as soon as she (plaintiff) came back from her trip; that on New Year's Day or January 2, 1955, declarant was at a party at plaintiff's apartment and several people were there, including deceased, at which time he "took declarant to the kitchen of said apartment out of the presence of the others and said: 'Marj, I have news for you. Mildred and I are going to get married.' Declarant interrupted and said, 'Excuse me, Bill, this is where I came in five years ago.' He said, 'No, I mean it, very soon.' " That deceased told plaintiff in declarant's presence that she should give up her television career.

The declaration of Charles Matter (plaintiff's brother), filed May 24, 1960, set forth among other things that during the period from early 1951 to December 1958, he had resided in Los Angeles; that during the period from January 1, 1952, to December 1958, he saw deceased at plaintiff's apartment hundreds of times and that he saw deceased and plaintiff at declarant's residence on six separate occasions when deceased and plaintiff were dinner guests of declarant; that he saw plaintiff prepare and serve food and drink to deceased at plaintiff's residence on numerous occasions and heard plaintiff tell deceased that he (deceased) should lie down and rest; that during 1958 deceased appeared to be in much poorer health than he had been in previous years and many times deceased called declarant and inquired where plaintiff was; that in 1954 at plaintiff's apartment, in the presence of plaintiff's aunt and uncle, deceased stated that he and plaintiff were going to be married very soon; that during the period from 1953 to 1955 and at other times, plaintiff produced, directed and acted in a number of television shows; that from 1954 to 1956, deceased stated to declarant and plaintiff that he (deceased) did not want plaintiff in television; that he wished

she would give up her television career; that he hoped she would give it up because they would be married soon and he did not want her in television; that during or about 1956, plaintiff did give up her television career and subsequent thereto, deceased stated that he was glad that she did. Declarant further set forth that in June 1956, deceased and declarant moved plaintiff's personal property and possessions from an apartment on Los Feliz Boulevard to an apartment on Beverly Glen; that deceased talked about the items of furniture he was going to buy when he and plaintiff were married and stated that the marriage would take place real soon; that in 1958 deceased had stated he had bought a house for plaintiff and himself in Arcadia but that the seller's wife refused to vacate the premises and that he expected to get possession very soon and spoke of how he expected the house to be furnished and that plaintiff and he would be very happy with it; that in May of 1959, deceased, plaintiff, one Alan Matter, declarant, and others had dinner together at which time deceased talked about the things he would do after the marriage and stated that the marriage would be real soon.

The declaration of Bertha B. Lininger, also filed May 24, 1960, set forth in effect that she met deceased during 1951 or 1952 and saw him several times each year thereafter to and including 1959; that declarant was in the dress shop operated by plaintiff during 1957, 1958, and 1959 on several different occasions and on each of those occasions deceased telephoned plaintiff; that she was in plaintiff's residence on several occasions when people were entertained and on each of these occasions deceased was present; that on several occasions deceased stated that he and plaintiff were going to be married and frequently spoke of the plaintiff's looking for a home for them to buy and that he would be very happy when they got married; that the deceased had stated that they would be married soon and during 1958 he stated that if anything happened to him the plaintiff would have no worries; that she was well taken care of by him. She also set forth that during the period from 1952 to 1955 deceased requested that plaintiff give up her career in television; that deceased never stated that he was married, although one time many months or possibly a few years after declarant had first seen him in the presence of plaintiff, plaintiff came to declarant, appeared upset and hurt, cried, and stated that she (plaintiff) had heard that deceased was married; that plaintiff never requested or asked deceased to divorce or leave his wife and he never

mentioned that he was married or discussed his wife as far as was known to declarant.

The declaration of plaintiff, Mildred Beach, was filed May 26. She set forth in effect that George L. Roberts introduced declarant to deceased as Bill Lewis and that this introduction took place at 645 South Olive Street in Los Angeles; that Mr. Roberts did not advise or inform her that Bill Lewis (i.e. deceased) was married and that declarant did not know or hear of the same or of such fact at any time until after deceased told declarant that he loved her, wanted to marry her and was going to marry her and she stated to him that she loved him and would marry him. She further stated that after declarant (plaintiff) and deceased were in love and had agreed to marry, deceased stated to her that if anything happened to him, he had taken care of her; that he had made such statements from 1954 through 1959 and frequently during each of said years stated to her that he wanted to marry her and that they would be married soon—within a few weeks; that prior to and during 1955 plaintiff was working and had a career in television producing, writing and acting and had developed many contacts, connections and skills pertaining thereto which had been established by hard work during a period of over five years; that at the request of deceased and in reliance on his promises and statements, she gave up this work and career and all of her television connections and has lost her skills and contacts in connection therewith, and she also gave to deceased companionship, comfort, society, love and affection; refrained from encouraging or making other friendships, companionships and acquaintanceships, and was unable to care for or be interested in any other man; that at no time did plaintiff demand or ask deceased to obtain a divorce or separate from his wife, but many times after deceased confessed that he was married he told plaintiff that he and his wife had been going their separate ways for over 10 years and that he and his wife were separated; that he and his wife had planned to obtain a divorce.

A second declaration of Charles Matter was filed May 26th wherein he set forth that deceased told him in 1953 that deceased had bought plaintiff a new car as a wedding gift and on two occasions gave declarant lumber for building purposes at his home and said, "Since I am going to be your brother-in-law, I want to help you all I can"; further that declarant "drove the lumber in William E. Arblaster's Pontiac station wagon and at another time drove the lumber in a large truck

which William E. Arblaster had loaded for declarant." He further set forth that deceased and declarant inspected a retail women's apparel store which plaintiff later acquired; that deceased stated on one of those occasions that since he had asked plaintiff to give up her television career, he wanted plaintiff to have the store "because we will be married real soon and it will let her have something to do." Declarant had gone to a grocery store with deceased to buy food and drink which plaintiff prepared and served to deceased. On several occasions deceased told declarant that he (deceased) had furniture in plaintiff's apartment made for her and stated to declarant that such pieces of furniture were to go into the new fine home that they were going to buy. During the first six or eight months that declarant knew deceased, he knew him as Bill Lewis. Several persons (i.e. Mr. and Mrs. George Roberts, plaintiff, deceased, declarant's wife, and declarant) had dinner together at plaintiff's apartment where she prepared and served the dinner; that during the evening there was a conversation about deceased's marrying plaintiff in the presence of the Roberts; that at no time did deceased or the Roberts mention the fact that deceased was married to someone else.

A second declaration of Mildred Beach was filed June 14, 1960. Therein she stated that she first met deceased at a restaurant; that this meeting occurred in 1950, at which time George Roberts introduced deceased as Bill Lewis; that nothing was said as to the fact that deceased was married; that it was several months after their meeting that plaintiff first learned deceased's true name was William Arblaster. Plaintiff stated that a few months after the first meeting, but before she heard the name Arblaster and before she had learned of his marital status, declarant and George Roberts were at a restaurant talking about the feelings and relationship of deceased and declarant for each other, and Mr. Roberts stated, "Why don't you two go to Las Vegas and get married?" At all times during the first many months after declarant met deceased she believed and assumed that he was not married and while she so believed, deceased asked her to marry him, promised that he would marry her, and she promised to marry him. That it was long thereafter that declarant first heard the name Arblaster and only then did she learn that he was married. (See footnote 2.) She confronted him with the statement that he was married and that his name was Arblaster instead of Lewis and that he admitted the foregoing and

stated that he was and had been separated from his wife; that he and his wife were planning to obtain a divorce; and that when he first met declarant he did not think he would fall in love with anyone and that the name he used was unimportant. Deceased often stated that he and his wife had not lived as man and wife for many years and had not lived together for years, and that financial matters had delayed the consummation of their planned divorce. That he often stated that he was separated; that the divorce would be granted in a few days and that the hearing had been delayed; that plaintiff learned only after his death that no divorce action had been filed. That on June 7, 1960, declarant, her attorney, and George Roberts had a conversation wherein declarant's attorney asked Mr. Roberts if he (Roberts) did not recall that the first meeting of plaintiff and deceased was in 1950 at one restaurant rather than another to which Mr. Roberts replied, ''Well, it could have been 1950 or 1951 or 1952.'' Declarant then asked if deceased was first introduced as Mr. Lewis rather than Mr. Arblaster and Roberts stated that he did not recall that; he also stated that he would not discuss his affidavit or answer any questions unless defendant's attorney, Mr. Welpton, was present. Declarant further stated that deceased had said that if she ever needed any help that she should turn to Mr. Roberts and that it was a long, long time before she knew deceased's name was Arblaster instead of Lewis. Mr. Roberts stated that he did not recall such a conversation. Declarant also stated that after she learned that deceased was married, deceased had always said that he was separated and that ''You (Roberts) knew we had planned to be married for a long time.'' Mr. Roberts stated there were a lot of things that he did not understand but he had given his deposition and was going to stand on that if he was called to testify and that if there were any further questions that declarant's attorney could take them up.

The declaration of Richard Boyer was filed on June 14, 1960. Therein he stated that he had met deceased eight or nine years ago in the presence of plaintiff and that deceased was introduced as Bill Lewis; that he knew deceased as Lewis for approximately one or two years. Declarant saw deceased many times during the three years thereafter, generally in the plaintiff's presence and that on one or more occasions plaintiff mentioned that she and deceased were going to be married; that deceased never denied this, but spoke of plans indicating that they were going to be married. Declarant further stated

that at no time prior to 1954 did deceased state or indicate or make any reference to his being married save and except only that in 1954 after declarant learned that deceased's real name was Arblaster and that he was already married, declarant said to deceased "So you and Millie are getting married." Deceased said, "Well, not right away. There are a few things that have to be settled first." Then declarant asked him, "Do you have the ring picked out?"—and he said, "I saw one I liked but I don't think I'll give it to her yet. She may hock it to pay for more dramatic lessons." Then deceased said, "I wish she would get out of it; it is too tough a business for her, and I don't think she will ever get any place in it." Further that the conversation from then on led into talk of the show business, about declarant's difficulties in the business and that it was tough for everybody and that declarant did not know whether declarant would get a break in it or not. Many times during 1951 or 1952 declarant was in dramatic productions with plaintiff; that plaintiff was on the Television Academy Board and was actively engaged in television.

It was stipulated that the contents of the deposition of Myrtle S. Davis taken by the plaintiff on February 29, 1960, be considered as an affidavit by the court in connection with the motion for summary judgment. In general, the deposition is to the effect that declarant first met deceased in the latter part of March 1956, when she, Myrtle S. Davis, was met at the Los Angeles airport by plaintiff and deceased; that she visited plaintiff on this occasion for about two weeks, went to San Diego and La Jolla for about two weeks and then returned for another week or ten days. She stated that she saw deceased almost every evening and that he took them to cocktails and dinner every night to various fine eating establishments; that deceased seemed to be a very jealous or possessive person; that deceased stated that he and plaintiff planned to be married; that he had lumber that he was holding out for a house and that they were in the process of looking for a house. He did not want to spend all of their time shopping but to help plaintiff look for a house. When the food was poorly prepared, deceased said that he and plaintiff would be getting married soon and would have their own furniture and a new stove. There were other statements concerning household items. Deceased also stated that when they got married he was going to get plaintiff a Lincoln for her wedding gift and at the same time mentioned a mink stole; he also stated that he did not approve of plaintiff's television work

and had requested her to give it up and that she had done so almost entirely and that he hoped that the deponent would not encourage plaintiff to go back into it again. Deponent also stated that when she visited the plaintiff in March and April of 1956, plaintiff was not doing anything that she knew of except just an occasional television appearance, but nothing else at that time. Prior thereto she knew that plaintiff had her own show. At the time she visited plaintiff in March and April of 1956, plaintiff did not go to work at any time and deponent did not know who was paying plaintiff's bills. Deponent stated that deceased always telephoned at night after he had left and reached his destination; he would call back to let them know he had arrived home safely. Plaintiff asked him to do that. Deponent would hear plaintiff's end of the conversation which would be, "Well, I am glad you are home safely," and, "Yes, I love you."

In January of 1957, plaintiff visited deponent in Milwaukee and deceased called every few days but he had a slight difficulty in his speech. It was deponent's understanding that deceased had a stroke. She found out from plaintiff that deceased was already married when plaintiff visited her in Milwaukee.

The motion was set to be heard on May 18, 1960. A minute order dated May 18 (a portion of which is set forth in footnote No. 2, *supra*), discloses that plaintiff withdrew her motion for a continuance and consented to the hearing of the motion for summary judgment; that defendant's motion for an order dismissing the action and for entry of summary judgment, and defendant's motion that the declaration of plaintiff be stricken pursuant to Code of Civil Procedure section 1880 were ordered to stand submitted as of May 25, 1960. Each party was given permission to submit additional authorities, and it was stipulated "(1) *that plaintiff knew as early as 1954 that William E. Arblaster was a married man,* (2) that the deposition of Myrtle S. Davis taken by plaintiff on February 29, 1960 shall be considered as an affidavit by the Court in connection with this motion and . . . (3) plaintiff shall have one week from today to file additional affidavits to be considered in opposition to this motion." (Emphasis added.)

The minute order of June 1, 1960, discloses that "The Motion for Summary Judgment is granted. Defendant's oral motion to strike the affidavit of Mildred Beach is denied. Defendant's counsel to prepare and submit a form of judg-

ment.'' Said minute order discloses the basis for the court's decision. It is stated as follows:

''The affidavits and stipulations show that decedent was married and plaintiff knew it prior to his alleged proposal to plaintiff. If the arrangement between plaintiff and decedent obligated decedent to break up his existing marriage for plaintiff's benefit, the scheme was contrary to public policy and plaintiff is in pari delicto. On the other hand if the proposed marriage was contingent on the dissolution of decedent's existing marriage under other circumstances, the contingency never arose. No legal damage could result from decedent's alleged intent not to perform because no performance ever came due.''

On June 14, 1960, plaintiff filed ''NOTICE OF MOTION; MEMORANDUM OF POINTS AND AUTHORITIES; SECOND DECLARATION OF MILDRED BEACH; DECLARATION OF RICHARD BOYER; PROPOSED FIRST AMENDED COMPLAINT FOR DAMAGES, etc.'' Plaintiff sought ''(1) . . . an order granting leave to file an amended complaint and that the attached First Amended Complaint be deemed such amended complaint without the necessity of filing any other or further documents; (2) . . . an order vacating the order granting the motion for summary judgment and reconsidering such motion and denying the same.'' The proposed amended complaint is captioned ''PROPOSED FIRST AMENDED COMPLAINT FOR DAMAGES (Fraud and deceit, inducing plaintiff to enter a marriage contract); FOR EQUITABLE PROMISSORY ESTOPPEL AND IMPOSITION OF A CONSTRUCTIVE TRUST AND LIEN; AND FOR REASONABLE VALUE OF SERVICES.''

The charging allegations of the first cause of action are that prior to 1954 deceased fraudulently concealed from plaintiff that he was a married man and during 1950 and 1951 plaintiff was fraudulently led to believe that deceased was a competent person to enter into a marriage contract; that when plaintiff believed that deceased was competent to marry, he made a proposal of marriage to her which she accepted. That at least once a month except for three months from January 1955 to August 1959, deceased fraudulently misrepresented that he would marry her within a very short period of time; that when plaintiff discovered that deceased was already married, he fraudulently misrepresented that he and his wife had been separated for over 10 years and were obtaining a divorce, and often during each of said years at such times he fraudulently represented that he had provided well for plaintiff and if anything happened to him she was and would be well

158

provided for. That at all times mentioned prior to August 12, 1959, in reliance upon the representations made by deceased, she ". . . gave to him companionship, comfort, society; all her love and affection, attention, rendered services to him; and plaintiff was at all times ready, willing and able to marry him. In reliance on his said fraudulent misrepresentations, plaintiff refrained from encouraging and making other friendships, companionships and acquaintanceships, remained unmarried, and during or about 1955 gave up her career in television producing, writing and acting, has lost her contacts, connections and skill pertaining thereto which she had established by hard work during a period of over five years."

It was further alleged that deceased made said fraudulent misrepresentations without any intention on his part of performing or carrying out the same, for the purpose of inducing plaintiff to enter into a marriage contract and to do the things herein alleged; that plaintiff did not discover, until after August 12, 1959, that deceased did not intend to marry her within a reasonable time; that he did not intend to provide for her; that he had not provided for her, and that the fraudulent representations made by deceased were wilfully false and malicious. Plaintiff alleged that she did not encourage deceased to prosecute a divorce action and that plaintiff did not at any time promote the dissolution of the bonds of matrimony between deceased and his wife. That as a direct and proximate result of the fraudulent misrepresentations made by deceased, plaintiff has been "deprived of any opportunities she might have had to make friendships with other persons, or to marry anyone else during said time, nor did said William E. Arblaster provide well or at all for her; plaintiff's affections have been blighted; she has suffered great and grievous mental pain and anguish, wounded pride, mortification, humilation, shame and disgrace, rendered services and given up other opportunities for companionships and acquaintanceships, gainful occupation and business endeavor, all to her damage in the sum of $425,000.00." Plaintiff then alleges that because the misrepresentations were made in a heartless way, with malice, the damages should also be awarded to her for the sake of example.

The second cause of action incorporates the allegations of the first cause of action and further alleges that by virtue of the promise made by deceased to plaintiff that he had provided for her and he intended to provide for her upon his death, which promise was made by him fraudulently and

without any intention on his part of performing it, plaintiff in reliance upon said promise gave up her television career and shows and plaintiff's economic position was changed and resulted in an injustice to plaintiff; that by reason of said promises decedent's estate is estopped from repudiating the aforesaid promise made by him and the assets of decedent's estate should be impressed with a constructive trust or equitable lien securing the fruits of the aforesaid promise made by him.

The third cause of action incorporated the allegations of the first cause of action and further alleged that:

"During the two years last past plaintiff at the request of said William E. Arblaster furnished goods and rendered services to him of the reasonable value of $10,000.00."

On June 17, 1960, defendant filed a "NOTICE OF MOTION TO STRIKE FROM THE DECLARATIONS OF MILDRED BEACH AND POINTS AND AUTHORITIES IN SUPPORT THEREOF."

The minute order dated June 20, 1960, discloses that the "Motion of plaintiff (1) for order granting leave to file amended complaint," was denied "without prejudice to the filing of a new suit based on the theory of quantum meruit." The motion "(2) for order vacating order granting motion for summary judgment," was denied. Insofar as plaintiff's motion "(3) for reconsideration of Motion for summary judgment" the court stood on the ruling previously made. The defendant's motion to strike from the declarations of Mildred Beach was denied.

On the same date, June 20th, the "JUDGMENT FOR DEFENDANT UNDER CCP SECTION 437C" was filed. It was entered on June 22, 1960. The judgment provided in pertinent part that "summary judgment be granted in favor of defendant Gladys G. Arblaster, Executrix of the Last Will and Testament of William E. Arblaster, also known as W. E. Arblaster, Deceased, and that plaintiff Mildred Beach take nothing by reason of her complaint. Defendant to recover costs in the sum of $52.95."

Plaintiff's Notice of Appeal was filed July 1, 1960, wherein "plaintiff . . . appeals . . . from the judgment in the above entitled matter, from the order denying a motion for leave to file an amended complaint in the above entitled matter, and from the motion to reconsider the court's order granting defendant Gladys G. Arblaster's motion to strike and dismiss the complaint and for summary judgment, and from the whole thereof."

The trial court's function in considering a motion for summary judgment is to ascertain whether there exists a triable issue of fact. (*McHugh* v. *Howard*, 165 Cal.App.2d 169 [331 P.2d 674]; *Dawson* v. *Rash*, 160 Cal.App.2d 154 [324 P.2d 959]; *Doyle* v. *Hibernia Bank*, 156 Cal.App.2d 16 [319 P.2d 412]; *Enos* v. *Foster*, 155 Cal.App.2d 152 [317 P.2d 670].) Whether a triable issue of fact exists is determined by the sufficiency of the affidavits of the parties. (*Doyle* v. *Hibernia Bank*, *supra*; Code Civ. Proc. § 437c; *Dorsey* v. *City of Los Angeles*, 132 Cal.App.2d 716 [282 P.2d 997].) Where the affidavits do not present any triable issue of fact, then the problem is resolved into a question of law and the trial court determines the issues of law. (*Bank of America* v. *Casady*, 15 Cal.App.2d 163 [59 P.2d 444]; *Bromberg* v. *Bank of America*, 58 Cal.App.2d 1 [135 P.2d 689], affirming summary judgment where solely issues of law were presented.)

Appellant contends that "The Promise to Marry was not Necessarily Either Contingent upon a Contingency which did not Occur or Void as being Against Public Policy."

As indicated in the statement of facts, appellant knew as early as 1954 that Mr. Arblaster was a married man. In spite of this knowledge, she continued to carry on a clandestine courtship with him up to the time of his death in 1959.

An agreement by a married man to marry another woman is void as opposed to public policy. Any agreement which has for its object the dissolution of the marriage contract or facilitates such dissolution is void as *contra bonos mores*. (*Pereira* v. *Pereira*, 156 Cal. 1, 5 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A. N.S. 880]; *Smith* v. *McPherson*, 176 Cal. 144, 146 [167 P. 875, L.R.A. 1918B 66]; *Hill* v. *Hill*, 23 Cal.2d 82, 92-94 [142 P.2d 417]; *Updeck* v. *Samuel*, 123 Cal.App.2d 264, 267 [266 P.2d 822]; *Whiting* v. *Whiting*, 62 Cal.App. 157, 165 [216 P. 92]; *Ponzi* v. *Ponzi*, 157 Cal.App.2d 772, 778-780 [321 P.2d 847]; 130 A.L.R. 1011.)

Appellant cannot maintain an action against a married man's estate predicated upon his illegal promise to marry her and leave her property under a will or otherwise. Appellant was *in pari delicto* because she knew he was married yet continued to carry on a relationship with him in reliance on his alleged promise to marry her, which, of necessity, was conducive to divorce or conditioned upon it and therefore void as opposed to public policy and good morals. (See *Beard* v. *Beard*, 65 Cal. 354, 355-356 [4 P. 229]; *Abbe* v. *Marr*,

14 Cal. 210; *Wallace* v. *Opinham,* 73 Cal.App.2d 25 [165 P.2d 709].)

Neither *Norman* v. *Burks,* 93 Cal.App.2d 687 [209 P.2d 815], nor *Mack* v. *White,* 97 Cal.App.2d 497 [218 P.2d 76], supports appellant's position. In both cases the action was for a return of property entrusted to the misrepresenting suitor. Nor does *Langley* v. *Schumacker,* 46 Cal.2d 601[3] [297 P.2d 977], support appellant's contention. In *Langley,* the plaintiff was not *in pari delicto* in seeking to rely upon an illegal promise to marry; the rationale of the opinion is based upon the irreparable damage to the plantiff; the issue of the statute of frauds (see *infra*) was not raised or passed upon; and plaintiff's claim was not barred by the statute of limitations (see *infra*).

▋ Any cause of action for fraud which appellant had is barred by the statute of limitations. Section 338 of the Code of Civil Procedure provides in pertinent part as follows:

''Within three years:

''1. . . .

''2. . . .

''3. . . .

''4. An action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.''

Appellant discovered the ''fraud'' in 1954 when she learned that Mr. Arblaster was already married. The action was not commenced until 1960.

▋ The alleged oral agreement to marry or to leave property under a will or otherwise is unenforceable by virtue of the statute of frauds. Section 1624 of the Civil Code provides in pertinent part:

''The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent:

''1. An agreement that by its terms is not to be performed within a year from the making thereof;

''2. . . .

---

[3] In 1959, the Legislature closed the loop-hole created by the *Langley* case by enacting section 43.4 of the Civil Code. This section became effective September 18, 1959, and provides that ''A fraudulent promise to marry or to cohabit after marriage does not give rise to a cause of action for damages.''

"3. An agreement made upon consideration of marriage other than a mutual promise to marry;

"4. . . .

"5. . . .

"6. An agreement which by its terms is not to be performed during the lifetime of the promisor, or an agreement to devise or bequeath any property, or to make any provision for any person by will.

"7. . . ."

In regard to subdivision 1 above, the only reference made to any divorce proceedings in the testimony submitted in behalf of the plaintiff (appellant) is contained in her declarations in which she quotes oral statements purportedly made by Mr. Arblaster. Even her statements, however, make no reference to any interlocutory decree of divorce having been entered and the evidence is uncontradicted that no divorce proceedings had ever been instituted. Under the law of this state, at least one year must elapse from the date of the entry of the interlocutory decree before a final decree of divorce can be entered. Thus, the agreement could not have been performed within one year.

Regarding subdivision 3 above, plaintiff is seeking to enforce an agreement to leave her property by will or otherwise, on the basis of or in consideration of an agreement to marry. Subdivision 6 defeats appellant's assertion that "The promise to provide for plaintiff upon death was enforceable." The purported promise "to provide well" was not only oral but is also indefinite. It is stated in 12 California Jurisprudence 2d, Contracts, section 107, pages 308-309:

"Whether an express contract is oral or written, there must be certainty and definiteness of language or words used in expressing the terms and in showing a meeting of the minds of the parties as to the terms. No action will lie to enforce the performance of a contract, or to recover damages for its breach, unless the contract be complete and certain; . . . A contract one seeks to enforce must be so certain that its meaning can be ascertained. An indefinite contract cannot be enforced because the courts cannot know to what the parties agreed. The meaning and intent of the parties must be placed beyond the bounds of mere conjecture.

". . . Where, . . . there has been no agreement upon an essential element and the contract provides no means for the determination thereof but leaves it to the negotiation and agreement of the parties, the contract is void. If matters in

the agreement are the subject of future ascertainment, the agreement is not final but indefinite and uncertain in its terms, and cannot be enforced.''

Appellant's contention that respondent should be estopped to assert the statute and that the promise should be enforced by quasi-specific performance is without merit. As stated in *Smith* v. *Smith,* 126 Cal.App.2d 194, 196-197 [272 P.2d 118]:

''Normally oral agreements to devise or bequeath any property or to make any provision for any person by will are unenforceable under the statute of frauds in the absence of a written memorandum thereof. (Civ. Code § 1624, subd. 6; Code Civ. Proc., § 1973, subd. 6.) However, under special circumstances which cause an estoppel to assert the statute of frauds, quasi-specific enforcement of such an oral contract will be permitted on an equitable basis. Appellant concedes that 'To enforce an oral contract to bequeath or devise property in equity by quasi-specific performance, *it must be shown that the contract is definite and certain, . . .*'' (Emphasis added.) (See *Parker* v. *Solomon,* 171 Cal.App. 2d 125 [340 P.2d 353].)

 Appellant cannot circumvent the impact of the statute of frauds by the mere device of contending that the action is not upon the invalid agreement, but is an action for damages for fraud. As stated in *Kroger* v. *Baur,* 46 Cal.App.2d 801, 803 [117 P.2d 50]:

''. . . Appellant contends that his action is not upon the invalid agreement, but is an action for damages for fraud, upon the theory that the oral promise . . . was made without any intention of performing it. . . . If the law can be thus nullified by the transparent device of predicating a tort action upon the invalid oral promise on the ground that the promisor did not intend to perform it, then the section might just as well be stricken from the statute. To license such a circuitous procedure to evade the provisions of such legislation would be to nullify and destroy its wholesome effect and the protection it affords against fraud.''

The trial court did not err in granting the summary judgment.

For the reasons stated, the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 20, 1961.