[L.A. No. 31842. July 25, 1985.]

MICHAEL L. TENZER, Plaintiff and Appellant, v.
SUPERSCOPE, INC., Defendant and Respondent.

**COUNSEL**

Merle H. Horwitz, Herbert A. Bernhard and Greenberg, Bernhard, Weiss & Rosin for Plaintiff and Appellant.

Nossaman, Guthner, Knox & Elliott and Alvin S. Kaufer for Defendant and Respondent.

**OPINION**

**GRODIN, J.**—Plaintiff Michael L. Tenzer (Tenzer) appeals from a judgment in favor of defendant Superscope, Inc. (Superscope) after the trial court granted Superscope's motion for summary judgment.

## FACTS

The facts, as revealed by Tenzer's complaint[1] and the papers filed in support of and in opposition to the motion for summary judgment, are these:

Superscope is a corporation listed on the New York Stock Exchange and authorized to do business in California. Joseph Tushinsky is the president of the corporation, as well as the chairman of its board of directors.

Tenzer has been involved in a management capacity in the real estate and housing industries in the western part of the United States for 20 years. Although he has extensive personal and business contacts among investors in the real estate field, Tenzer is not a licensed real estate broker.

Tenzer and Tushinsky served together on the board of directors of a charitable organization in Los Angeles. Sometime prior to May of 1979, they began to discuss the possibility that Tenzer should become a member of the Superscope board of directors (Board).

On May 10, 1979, at Tushinsky's invitation, Tenzer attended a Board meeting. At this meeting Tenzer learned, for the first time, that Superscope was attempting to sell its corporate headquarters to meet pressing cashflow problems. The next day, Tenzer was elected to the Board at the corporation's annual meeting. At a Board meeting the same day, the need to sell the corporation's headquarters was again discussed.

The next meeting of the Board occurred on June 22, 1979. At this meeting, the outside directors,[2] including Tenzer, first learned the details of Superscope's financial predicament. The Board was informed that the corporation was technically in default on over $45 million in loans and that the corporation's banks were threatening to accelerate payment on these loans. The Board was also told that a cash sale of the corporate headquarters was imperative to avoid reorganization pursuant to the federal Bankruptcy Act. The headquarters building, together with other property and facilities including a warehouse, parking lot, and adjacent undeveloped acreage, had been on the real estate market for nearly a year, but Superscope's real estate broker had not yet been able to effect a sale. The asking price for the property was approximately $16 million. At this meeting, Tushinsky ex-

---

[1] In its motion for summary judgment, Superscope argued that, even if all the facts alleged in Tenzer's complaint and supporting papers were true, he was entitled to no relief as a matter of law. For this reason, Superscope submitted no factual declarations to counter the truth of Tenzer's allegations.

[2] An outside director is a director who has no interest or other duties in the corporation other than as a director.

pressed his view that the situation was desperate and that a miracle was needed to save the corporation.

Subsequently, Tushinsky, in a phone conversation, implored Tenzer personally to seek a suitable buyer for the property. Shortly afterwards, Tenzer became aware that Paul Amir, a Beverly Hills-based entrepreneur, was interested in negotiating a quick-closing real estate purchase for tax reasons. The Superscope headquarters appeared to be precisely the sort of property which would suit Amir's needs. Tenzer discussed the Superscope property with Amir without revealing its identity and verified that Amir might be interested in buying it.

With this information in hand, Tenzer telephoned Tushinsky. He explained that he was calling not in his capacity as a Board member, but as a finder, that he had located a potential buyer for the corporate headquarters and that, should the sale be consummated, he would expect a finder's fee of 10 percent. Tushinsky responded enthusiastically, authorizing Tenzer to discuss the matter further with his contact. Tushinsky also indicated that payment of a finder's fee was entirely proper, that the requested fee was satisfactory, and that if a $16 million sale were to close when expected, Tenzer's fee would be earned and payable upon the closing.

Neither Tenzer nor Tushinsky discussed the need to reduce the finder's fee agreement to writing. Tenzer felt that their personal relationship and Tushinsky's integrity were sufficient assurance that he would be paid. In reliance upon Tushinsky's promise, Tenzer then revealed each party's identity to the other.

The Board accepted Amir's offer in July 1979. A contract for the sale of Superscope's headquarters to Amir was consummated in August, and the sale was ultimately closed.

Tenzer was aware of other real estate opportunities for Amir, but he refrained from exploring such opportunities on Amir's behalf in reliance upon Tushinsky's promise that he would receive a finder's fee from the Superscope sale. Prior to the Board's approval of the Amir transaction, Tenzer informed it that he was entitled to a finder's fee in the event of a sale to Amir. He did not, however, reveal the amount of the finder's fee to which Tushinsky had agreed.[3] Tenzer took no part in the deliberations concerning or in the vote approving acceptance of Amir's offer.

---

[3]Tenzer felt that it was Tushinsky's duty to disclose to the Board the amount of the finder's fee. He asserts that a fee of 10 percent was reasonable given the precarious financial condition of Superscope and the fact that the sale saved Superscope from bankruptcy.

At the July 27, 1979, Board meeting at which the sale to Amir was approved, a discussion regarding the payment of finders' fees to directors was held, but a final decision on the issue was deferred to the next Board meeting on August 24, 1979. At the August meeting, a motion was made to authorize the payment of finders' fees to corporate directors. Tenzer maintains that the discussion involved only whether such fees would be approved for future transactions, and did not touch upon approval of the finder's fee arrangement he had already made with Tushinsky. He believed that the Board had ratified that arrangement when it accepted Amir's offer in July. In any case, Tenzer participated in the August discussion and voted on the motion. Part of the discussion centered upon whether such fees were permitted under the corporate bylaws.[4] All outside directors voted in favor of the resolution authorizing payment of finders' fees. All the "inside" directors (including corporate employees and members of the Tushinsky family) voted against. The resolution was defeated. Tenzer has never received a finder's fee for his services in connection with the Amir transaction.

Tenzer filed suit against both Superscope and Tushinsky. He alleged three "causes of action" which he entitled "Breach of Contract and Unjust Enrichment," "Estoppel," and "Fraud." The complaint further alleged that, in making the promise to pay him a 10 percent finder's fee, Tushinsky had acted as the agent of the corporation, and that he made the promise fraudulently, with no intent to perform. Rather, Tenzer alleged, Tushinsky intended to cheat him by inducing him to reveal Amir's name while secretly harboring an intent to prevent payment of the agreed fee.

After a hearing on the merits, Superscope's motion for summary judgment pursuant to Code of Civil Procedure section 437c was granted.[5] Tenzer filed a timely appeal from the judgment in favor of Superscope. For the reasons stated below, we reverse.

---

[4]Superscope's bylaws provide in pertinent part as follows:
"ARTICLE III
"DIRECTORS
"SECTION 1: POWERS. . . . [¶] Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the directors shall have the power and authority to: [¶] (a) Select and remove all officers, agents, and employees of the corporation, . . . and . . . fix their compensation . . . .
"SECTION 14: FEES AND COMPENSATION OF DIRECTORS. Directors . . . may receive such compensation, if any, for their services, . . . as may be fixed or determined by resolution of the board of directors. Nothing hereincontained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation for such services."

[5]Tushinsky is not a party to the judgment entered below or to this appeal.

## Discussion

Tenzer's contentions on appeal may be summarized as follows:

1. There is a finder's fee exception to the statute of frauds contained in Civil Code section 1624, subdivision 5. Therefore, an oral contract to pay a finder's fee in a real estate transaction is enforceable.

2. Even if the statute of frauds would normally preclude enforcement of an oral finder's fee contract, in this case Tenzer performed in reliance upon the agreement and Superscope retained the benefits. This should operate as an estoppel to assert the statute of frauds as a defense.

3. Because of Tushinsky's misrepresentations, Tenzer may maintain an action for fraud even if the underlying oral agreement is unenforceable.

4. Summary judgment was inappropriate because of the presence of triable issues of fact.

As explained further below, we find that, liberally construed, the papers Tenzer submitted in opposition to the motion for summary judgment are sufficient to raise triable issues of fact as to the second and third of these contentions. Thus summary judgment was inappropriate. (See, e.g., *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953].) However, we find no merit in Tenzer's first argument.

### I.

Civil Code section 1624, provides in pertinent part as follows: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: . . . 5. An agreement authorizing or employing an agent, broker, or any other person to . . . find a purchaser or seller of real estate . . . for compensation or a commission; . . ."

In his first cause of action, Tenzer attempts to claim damages based upon breach of an alleged oral contract employing him to find a purchaser of real estate for a commission. He does not allege that the contract was ever put in writing. Under the plain language of the statute this contract, if it was entered into, was invalid.

Tenzer argues that precedent establishes the statute is irrelevant to his claim. He cites several cases, including *Tyrone* v. *Kelley* (1973) 9 Cal.3d 1

[106 Cal.Rptr. 761, 507 P.2d 65]; *Rees* v. *Dept. of Real Estate* (1977) 76 Cal.App.3d 286, 295 [142 Cal.Rptr. 789]; and *Spielberg* v. *Granz* (1960) 185 Cal.App.2d 283 [8 Cal.Rptr. 190], for the proposition that there is a "finder's exception," both to licensing laws and the statute of frauds. He is in error. Those cases merely stand for the principle that a finder in a real estate transaction need not be licensed as a real estate broker to collect a finder's fee. They state nothing about a finder's exception to the statute of frauds. As noted in *Grant* v. *Marinell* (1980) 112 Cal.App.3d 617 [169 Cal.Rptr. 414], the Legislature has gone to considerable lengths to clarify that finders' agreements such as this must be memorialized in writing to be enforceable:

"Before 1963, the so-called oral 'finder's agreement,' that is an agreement merely to introduce a seller of real estate to a prospective purchaser or a purchaser to a prospective buyer, was held not to be within the statute of frauds, whether such contract was made by a real estate broker or agent or by an unlicensed person. (See *Heyn* v. *Philips* (1869) 37 Cal. 529, 531; *Palmer* v. *Wahler* (1955) 133 Cal.App.2d 705, 710 [285 P.2d 8].)

"In 1963, however, the Legislature amended subdivision 5 to add, inter alia, the italicized language: 'An agreement authorizing or employing an agent or broker to purchase or sell real estate, . . . *or to procure, introduce, or find a purchaser or seller of real estate* or a lessee or lessor of real estate where such lease is for a longer period than one year, for compensation or a commission.' (Stats. 1963, ch. 814, § 1, p. 1843.)

"If by this amendment the Legislature intended all finder's fee agreements to come within the ambit of the statute of frauds, it failed, as was predicted in the State Bar Journal's review of 1963 legislation (38 State Bar J. 604, 649). [Fn. omitted.] The section, as amended, was interpreted to bar only oral finder's agreements between licensed brokers or agents and sellers or purchasers of property. Subdivision 5, as revised, was still held to be inapplicable to such oral agreements by unlicensed individuals. (See *Hasekian* v. *Krotz* (1968) 268 Cal.App.2d 311, 317 [74 Cal.Rptr. 410]; *Porter* v. *Cirod, Inc.* (1966) 242 Cal.App.2d 761, 766 [51 Cal.Rptr. 784].) This anomaly resulted in the 1967 amendment (Stats. 1967, ch. 52, § 1 p. 953), which added the following italicized language: 'An agreement authorizing or employing an agent, *or any other person* to purchase or sell real estate . . . or to procure, introduce or find a purchaser or seller . . . .' " (*Id.*, at pp. 620-621, original italics.)

Tenzer also refers us to *Zalk* v. *General Exploration Co.* (1980) 105 Cal.App.3d 786 [164 Cal.Rptr. 647], and a passage from *Tyrone* v. *Kelley, supra,* 9 Cal.3d 1, 12-13, but these decisions merely involve oral agree-

ments for finder's fees in nonrealty transactions, and therefore are inapposite to this case.

We conclude that Tenzer's action based on contract would ordinarily be barred by the statute of frauds. ▮▮▮▮ Tenzer asserts, however, that even if the finder's fee agreement was oral, and in violation of the statute of frauds, he has alleged facts sufficient to invoke the estoppel doctrine and thus to foreclose Superscope from relying upon the statute of frauds as a defense. In brief, Tenzer alleges that Tushinsky—as Superscope's representative—promised to pay him for valuable information which could have been sold elsewhere. In reliance on this promise, Tenzer surrendered Amir's name. Superscope, having profited from Tenzer's performance, now refuses to keep its end of the bargain.

▮▮▮ The doctrine of estoppel to plead the statute of frauds may be applied where necessary to prevent either unconscionable injury or unjust enrichment. (*Monarco* v. *Lo Greco* (1950) 35 Cal.2d 621, 623-624 [220 P.2d 737].) On the basis of the factual contentions advanced in Tenzer's papers, Superscope has received the benefit of Tenzer's performance but relies upon the statute of frauds to avoid paying the agreed-upon price. Provided that Tenzer was not otherwise obligated to reveal this information to Superscope—a point which we consider further, *infra*—these allegations suggest a case of unjust enrichment as that term was defined in *Monarco* v. *Lo-Greco, supra,* at page 624. In such cases, the doctrine of estoppel to assert the statute of frauds may be applied in the interests of fairness.

▮▮▮ Superscope argues that, as a real estate finder, Tenzer may not invoke the equitable doctrine of estoppel. It relies upon a series of cases which have established that " 'an estoppel to plead the statute of frauds cannot be predicated upon the . . . refusal to comply with an oral promise to pay a [real estate] commission.' " (*Keely* v. *Price* (1972) 27 Cal.App.3d 209, 212 [103 Cal.Rptr. 531], quoting *Herzog* v. *Blatt* (1947) 80 Cal.App.2d 340, 343 [180 P.2d 30]; see also *Hicks* v. *Post* (1908) 154 Cal. 22 [96 P. 878]; *King* v. *Tilden Park Estates* (1958) 156 Cal.App.2d 824 [320 P.2d 109]; *Augustine* v. *Trucco* (1954) 124 Cal.App.2d 229 [268 P.2d 780]; *White* v. *Hirschman* (1942) 54 Cal.App.2d 573, 574 [129 P.2d 430]; *Sweeley* v. *Gordon* (1941) 47 Cal.App.2d 381 [118 P.2d 14].)

Superscope's reliance is misplaced. The cases it cites all involved licensed real estate brokers. The rationale for rigorous application of the statute of frauds to bar claims by licensed real estate brokers is related to the statutory licensing requirements. "Real estate brokers are licensed as such only after they have demonstrated a knowledge of the laws relating to real estate transactions (Bus. & Prof. Code, §§ 10150, 10153), and it would seem that they

would thus require less protection against pitfalls encountered in transactions regulated by those laws. In *Pacific Southwest Dev. Corp.* v. *Western Pac. R. R. Co.* [1956] 47 Cal.2d 62 [301 P.2d 825], the court stated at page 70: 'Plaintiff is a licensed real estate broker and, as such, is presumed to know that contracted for real estate commissions are invalid and unenforceable unless put in writing and subscribed by the person to be charged. [Citations.] Nevertheless, plaintiff failed to secure proper written authorization to protect itself in the transaction. Rather it assumed the risk of relying upon claimed oral promises of defendant, and it has no cause for complaint if its efforts go unrewarded.' " (*Franklin* v. *Hansen* (1963) 59 Cal.2d 570, 575 [30 Cal.Rptr. 530, 381 P.2d 386]; see also *Jaffe* v. *Albertson Co.* (1966) 243 Cal.App.2d 592, 603-604 [53 Cal.Rptr. 25]; *King* v. *Tilden Park Estates, supra,* 156 Cal.App.2d 824, 830.)[6]

This rationale is inapplicable to "finders," who need not be licensed brokers, or even involved in the real estate business professionally. We, therefore, decline to extend the scope of the *Keely* v. *Price* rule to unlicensed finders such as Tenzer. Tenzer is entitled to invoke the doctrine of estoppel to plead the statute of frauds. On the facts alleged, Superscope's motion for summary judgment was improperly granted.

## II.

■ Tenzer's complaint also sets forth an alternative basis for relief, seeking damages for fraud. Tenzer alleges that Tushinsky, acting for Superscope, deliberately misled him by falsely promising to compensate him for his services as a finder. Tenzer acted in reliance upon these misrepresentations and has suffered damage. Therefore, Tenzer asserts that, regardless of whether the oral contract is enforceable, he may maintain an action in tort for fraudulent misrepresentation.

---

[6]We note that the rules withholding traditional equitable remedies, such as recovery in quantum meruit and the doctrine of estoppel, from real estate brokers have been vigorously criticized. (See, e.g., Comment, *Equitable Estoppel and the Statute of Frauds in California* (1965) 53 Cal.L.Rev. 590, 602, 609; Note, *Oral Employment Contracts and Equitable Estoppel: The Real Estate Broker as Victim* (1975) 26 Hastings L.J. 1503; 1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 1:54, pp. 69-74, fn. 8.) Miller and Starr suggest that this issue may be due for reexamination in light of changed conditions in the real estate field. (*Ibid.*) In today's market, they assert, brokers often deal with sophisticated principals in superior bargaining positions. In such circumstances, the broker is powerless to compel the principal's cooperation in executing a written commission agreement and denial of the broker's claim for a commission based on failure to comply with the requirements of the statute of frauds is unjust. Whether or not there is merit in these arguments, we reserve for another day the question whether licensed brokers may invoke equitable remedies to avoid the sometimes harsh results of the statute of frauds. As noted above, the question is not presented in this case.

A series of cases have held that an action for fraud cannot be maintained where the allegedly fraudulent promise is unenforceable as a contract due to the statute of frauds. The rule was stated in *Kroger* v. *Baur* (1941) 46 Cal.App.2d 801, 803 [117 P.2d 50], as follows: "Appellant contends that his action is not upon the invalid agreement, but is an action for damages for fraud, upon the theory that the oral promise to pay him a commission was made without any intention of performing it and for the purpose of inducing him to waive a written memorandum. If the law can be thus nullified by the transparent device of predicating a tort action upon the invalid oral promise on the ground that the promisor did not intend to perform it, then the section might just as well be stricken from the statute. To license such a circuitous procedure to evade the provisions of such legislation would be to nullify and destroy its wholesome effect and the protection it affords against fraud." (See also *Keely* v. *Price, supra,* 27 Cal.App.3d 209, 215; *Owens* v. *Foundation for Ocean Research* (1980) 107 Cal.App.3d 179 [165 Cal.Rptr. 571]; *Beach* v. *Arblaster* (1961) 194 Cal.App.2d 145, 163 [14 Cal.Rptr. 854].)

But the *Kroger* rule has been criticized and, in 1978, Justice Kaus—then sitting on the Second District Court of Appeal—invited this court to disapprove it. Today we accept his invitation.

As Justice Kaus observed: "Several considerations point to a demise of the *Kroger* rule . . . . In brief: 1. The 'better' rule is contra. Comment (c) to section 530 of the Restatement Second of the Law of Torts states that a misrepresentation of one's intention is actionable even 'when the agreement is oral and made unenforceable by the statute of frauds, or when it is unprovable and so unenforceable under the parol evidence rule.' 2. The broad statement of the *Kroger* rule is difficult to reconcile with the principle that a party may be estopped to assert the statute of frauds where such estoppel is necessary 'to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances.' (*Monarco* v. *Lo Greco* (1950) 35 Cal.2d 621, 623.) 3. It is simply untrue that a plaintiff who undertakes to plead and prove actionable fraud is attempting to get around the statute of frauds by a 'transparent device.' *Kroger* seems to assume the inability of a jury to distinguish between an unkept but honest promise and one which the promisor never intended to perform. The law is otherwise. (*People* v. *Ashley* (1954) 42 Cal.2d 246, 263-264 [267 P.2d 271].) 4. The provision of the statute of frauds which spawned *Kroger* was Civil Code section 1624, subdivision 5, relating to agreements for real estate brokers' commissions. The law has traditionally had little sympathy with the broker who has failed to sign up his client. (E.g., *Augustine* v. *Trucco* (1954) 124 Cal.App.2d 229, 237-238 [268 P.2d 780].)" (*Southern Cal. etc. Assemblies of God* v. *Shep-*

*herd of Hills etc. Church* (1978) 77 Cal.App.3d 951, 958, fn. 3 [144 Cal.Rptr. 46].)

In addition, the *Kroger* approach is inconsistent with the general rule " 'that the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme.' " (*Seymour* v. *Oelrichs* (1909) 156 Cal. 782, 794 [106 P. 88], quoting 2 Pomeroy's Equity Jurisprudence, § 921; see also *Moore* v. *Day* (1954) 123 Cal.App.2d 134, 138 [266 P.2d 51]; 3 Williston on Contracts (3d ed. 1960) § 533A, p. 802.)

■ Nor do we agree with the view that the *Kroger* rule is necessary to prevent the nullification of the statute of frauds. This view is perhaps based upon the notion that, when the statute of frauds clearly bars an action in contract, a disappointed promisee should not be allowed to present his claim for compensation to a jury simply by recasting his complaint to include an allegation of misrepresentation. If it were, in fact, that easy to reach a jury on a claim of fraud, we might agree. Fortunately, this is not the case. To survive a motion for a nonsuit (Code Civ. Proc., § 581c), plaintiff in an action on a fraudulent promise must produce evidence of the promisor's intent to mislead him.

Some California cases have stated broadly that "[t]he subsequent failure to perform as promised warrants the inference that defendant did not intend to perform when she made the promise. [Citations.]" (*Santoro* v. *Carbone* (1972) 22 Cal.App.3d 721, 728 [99 Cal.Rptr. 488]; see also *Jarkieh* v. *Badagliacco* (1946) 75 Cal.App.2d 505, 509 [170 P.2d 994].) This may suggest that proof that a promise was made and that it was not fulfilled is sufficient to prove fraud. This is not, and has never been, a correct statement of the law, and we disapprove the cases cited to the extent they suggest otherwise.

Rather, "something more than nonperformance is required to prove the defendant's intent not to perform his promise." (*People* v. *Ashley* (1954) 42 Cal.2d 246, 263 [267 P.2d 271]; see also *Jacobson* v. *Mead* (1936) 12 Cal.App.2d 75, 82 [55 P.2d 285]; *Justheim Petroleum Company* v. *Hammond* (10th Cir. 1955) 227 F.2d 629, 637; Rest.2d Torts, § 530, com. d.; Prosser, Torts (5th ed. 1984) § 109, p. 764.) To be sure, fraudulent intent must often be established by circumstantial evidence. Prosser, for example, cites cases in which fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform. (Prosser, *supra,* at pp. 764-765.) How-

ever, if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury. The policies of the statute of frauds will not be subverted by affording plaintiffs who can prove actual fraud the opportunity to do so.

■ For these reasons, we disapprove of *Kroger* v. *Baur* and its progeny. We conclude that Tenzer's papers were sufficient to raise triable issues of fact on a cause of action for fraudulent misrepresentation.

### III.

■ In its motion for summary judgment, Superscope contended that, even if Tenzer had had a commission agreement, he acted as a real estate broker and cannot recover because he was not licensed. (Bus. & Prof. Code, § 10136.) Whether Tenzer acted as a broker is a question of fact, requiring an examination of his conduct after the introduction of the buyer and seller, to determine whether he participated in their negotiations. (*Lyons* v. *Stevenson* (1977) 65 Cal.App.3d 595, 605-606 [135 Cal.Rptr. 457].) ■ ■ ■ ■ The record does not permit adjudication of this factual question on a motion for summary judgment.[7]

### IV.

Finally, we address Superscope's contention that in light of Tenzer's fiduciary obligations as corporate director any reliance by him upon Tushinsky's promise was unreasonable as a matter of law.

At the time of the alleged agreement, Tenzer was a member of Superscope's Board. As such, he bore a fiduciary relationship to Superscope and to all its stockholders. (*Remillard Brick Co.* v. *Remillard-Dandini* (1952) 109 Cal.App.2d 405, 419 [241 P.2d 66].) ■ Well-established principles of corporations law hold that a "director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent." (*Id.*, at p. 418.) "[Directors'] dealings with the corporation are

---

[7]Superscope also advanced a somewhat confused theory of "waiver"; alleging that, by giving misleading answers on questionnaires Superscope distributed in 1980 and 1981, Tenzer had waived his claim against the corporation.

The use of the term "waiver" in a contractual context is ambiguous and uninformative. (See generally 5 Williston on Contracts (3d ed. 1961) § 678, p. 238 et seq.) As Professor Williston notes, an agreement to discharge from liability previously incurred is more normally denominated a release. Civil Code section 1541 permits the extinction of an obligation, unsupported by consideration, provided that the release is in writing. The writing must, however, expressly show the creditor's intent to extinguish the obligation. (*Golden West Credit etc. Co.* v. *Wilson* (1932) 119 Cal.App. 627, 636 [7 P.2d 345].) In our view, Tenzer's answers on the 1980 and 1981 questionnaires express no such intent.

subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director . . . not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citation.] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. [Fn. omitted.] If it does not, equity will set it aside." (*Pepper* v. *Litton* (1939) 308 U.S. 295, 306-307 [84 L.Ed. 281, 289, 60 S.Ct. 238].) "[T]ransactions that are unfair and unreasonable to the corporation may be avoided." (*Remillard Brick Co.*, *supra*, at p. 418, see also 1 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1984) § 103.01, pp. 6-20.1–6-21.)

■ As a corporate director, Tenzer is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's option if it were determined to be unfair or unreasonable to the corporation. Thus, in order to prove that his reliance upon Tushinsky's promise was justifiable, Tenzer will be required to prove that the arrangement was fair and reasonable to the corporation.

Establishing whether Tenzer's agreement with Superscope was fair and reasonable involves determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to these facts. These are functions mainly for the trier of facts. (See *Mueller* v. *MacBan* (1976) 62 Cal.App.3d 258, 276 [132 Cal.Rptr. 222]; see also *MacEwen* v. *Star-Kist Foods, Inc.* (E.D.N.Y. 1966) 251 F.Supp. 33.)

For the guidance of the trial court in overseeing this factfinding process, we offer the following observations. In ever-increasing numbers, we derive our livelihoods from transactions in information rather than property or labor. In addition to real estate professionals, lawyers, bankers, and accountants, as well as consultants in any number of fields often sell what they *know* as much as what they *do*. Many of these same professionals serve as directors on the boards of corporations for which they also work. The ethics and wisdom of serving on the board of a corporation to which one regularly renders professional services has been questioned. (See Knepper, *Liability of Lawyer-Directors* (1979) 40 Ohio St. L.J. 341; see also Ruder, *The Case Against the Lawyer-Director* (1975) 30 Bus. Law. 41.) Yet the practice is widespread and has its defenders, who point out that corporations should not be deprived of the special skills such "interested directors" can provide, and that the potential for conflicts of interest can be avoided by full disclosure and establishment of procedures to assure conscientious adherence to ethical standards of fairness. (See, e.g., Note, *Should Lawyers*

*Serve as Directors of Corporations for Which They Act as Counsel?* 1978 Utah L.Rev. 711.)

Certainly it would be unfair to require such directors to surrender gratuitously to their corporations information or advice for which they would otherwise be paid in the normal course of their business. At the same time, we discern nothing oppressive in the view that corporate directors should be required, as a facet of their role as fiduciaries, to pass on information vital to the survival of their corporations which either is incidental to the directors' usual mode of earning a living or was casually acquired.

The determination whether Tenzer's agreement with Tushinsky was fair and reasonable to Superscope involves evaluation of the specific facts surrounding the transaction. Was Tenzer dependent upon transactions of this sort for his livelihood? If so, was this fact known to Tushinsky? Was it known that, by revealing Amir's name to Superscope, Tenzer would be forgoing the opportunity to sell the same information in other quarters?

How did Tenzer become aware of Amir's interest in a deal of this sort? Directors may be more obligated freely to disclose information which "falls into their laps" than information obtained by employing the skills and resources normally used in their professions.

How did the price Tenzer asked for his information compare to the usual commission for such information in this real estate market? Did Superscope's bylaws specifically allow or prohibit compensation of directors for professional services? This list of questions is by no means exhaustive.

The answers to these questions are also pertinent to Tenzer's claim of estoppel to plead the statute of frauds. ▇▇ Estoppel is an equitable remedy and, as such, will only be applied to avoid injustice. If reliance upon Tushinsky's promise was unjustified in light of Tenzer's position as a director, equity does not require that Tenzer be allowed to enforce the promise. (See generally Rest.2d Contracts, § 139.) At the same time, this factual inquiry may establish that, because of his fiduciary relationship to the corporation, Tenzer was obligated to reveal his information without seeking compensation. If so, the corporation cannot be said to be unjustly enriched by retaining the benefits of Tenzer's information but refusing to pay for it. Thus, Tenzer will have to establish that his behavior was reasonably consistent with his fiduciary role in order to invoke the doctrine of estoppel.

Resolution of this issue requires information which, at this point, does not appear in the record. For this reason, we conclude that summary adjudication was inappropriate.

The judgment is reversed.

Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.