[Civ. No. 3489. Second Appellate District, Division One.—April 8, 1921.]

MAMIE E. HARLAN, Respondent, v. EDGAR H. WILLARD et al., Appellants.

[1] SPECIFIC PERFORMANCE—ORAL CONTRACT TO WILL PROPERTY—INITIATION OF ADMINISTRATION PROCEEDINGS—ABSENCE OF FRAUD.—An oral contract made prior to the amendment of the statute of frauds to leave property by will in consideration of personal services is not unenforceable by reason of the fact that the promisee filed a petition for letters of administration and an application for a family allowance based upon the alleged claim that she was the widow of the promisor, where such proceedings were taken upon advice and without any intent to defraud the estate, and were subsequently abandoned and no money or property received thereunder.

APPEAL from a judgment of the Superior Court of Los Angeles County. J. P. Wood, Judge. Affirmed.

1. Validity of oral agreement to devise land, notes, 5 Ann. Cas. 495; 20 Ann. Cas. 1137; Ann. Cas. 1915A, 463.
Remedy of person performing services under void contract for devise, note, Ann. Cas. 1913A, 288.

The facts are stated in the opinion of the court.

Rupert B. Turnbull, Turnbull, Heffron & Kelley and
Ralph Woods Pontious for Appellants.

Kemp, Mitchell & Silberberg for Respondent.

JAMES, J.—Plaintiff by the judgment herein was de-
termined to be the owner of one-half of the property of the
estate of C. A. Willard, deceased. It was decreed that de-
fendants held the same in trust for her benefit. From that
judgment this appeal is taken.

In 1901 the plaintiff was employed as a waitress in a
restaurant and was then twenty years of age. C. A. Wil-
lard was then of the age of forty-one years. Prior to his
acquaintanceship with the plaintiff he had been married and
divorced and there were two children of that marriage,
to wit, Edgar H. Willard and Dorothea Laura Blodgett,
appellants here. According to a statement made by Willard
to the plaintiff (as to the correctness of which no dispute is
shown in the record), Willard's first wife had remarried and
Laura Blodgett, the daughter, had been adopted by her step-
father when about the age of ten years. After forming the
acquaintance with the plaintiff, Willard began to pay par-
ticular attention to her and frequently took her to places
of amusement. Sometimes a married sister of the plaintiff
accompanied the two; at other times they went alone.
About a month after the acquaintanceship began, Willard,
according to the testimony of the plaintiff, made a proposal
to the plaintiff which is best shown by presenting a narrative
of her testimony on that point: "Q. Did you ever have a
conversation with Mr. Willard about becoming his house-
keeper? A. I did. We were dining out, but I do not re-
member where. He wanted to know if I would be willing
to come and keep house for him; be his housekeeper. He
told me if I would come and be his housekeeper and help
him and stay as long as he lived, that he would furnish me
a home and my clothing, and take care of me in case of
illness, and at his death he would leave me half of anything
that he had. Q. What did you say at that time, if any-
thing? A. Well, I would not give any definite answer. I
wanted to think it over. Q. Did you ever discuss the matter

at a further time? A. Often after that. Q. Give as nearly as possible these conversations and your replies. A. Well, they were all practically the same. He wanted that I should keep house for him and do what any housekeeper would do. There was nothing more than I told you. He wanted me to do what any housekeeper is supposed to do in keeping house; to cook, wash dishes, sweep and dust, and take care of him if he was sick, but there was nothing else mentioned.'' Plaintiff testified further that, after considering the proposal for some time, she accepted the offer. For a while the three, Willard, plaintiff, and her sister, jointly occupied a set of apartments, Willard making use of one bedroom, the two women another, and all having their meals together. The housework was attended to by plaintiff and her sister. Later on, the plaintiff resided with Willard in one of a set of flats owned by him and continued to perform the household duties agreed upon, and continued to so perform them for seventeen years and up to the time of Willard's death; she bestowed much personal attention and painstaking care upon the latter, who was at times addicted to the excessive use of intoxicating liquors. Willard's business was that of a saloon-keeper. From about the year 1910 on the couple lived in a house toward the building of which plaintiff contributed some money which she had received from the sale of a lot. Plaintiff testified to repeated statements made by Willard of his intention to fulfill his agreement to divide his property equally between her and his son Edgar. She testified that he had said because his daughter Dorothea had been adopted by her stepfather, that she was no longer his child and that he did not want her to have anything of his. Other witnesses testified to having heard Willard assert that he intended to leave to the plaintiff one-half of his property, and Mrs. Scott, the sister of the plaintiff, testified to having been present when Willard made the original proposal to her sister in the terms already stated. It is not argued, and upon the evidence the case admits of no such contention, that the finding of the court as to the making of the contract in the manner and upon the conditions described by the plaintiff is not abundantly supported. The fact that plaintiff admitted that she had during the years mentioned lived with Willard as his wife is made the ground for the claim that the contract as

made was against good morals and, therefore, illegal. The contract, as found by the court to have been made and as testified to by the plaintiff, contained no condition that the agreement of Willard depended upon the relation of a mistress being assumed by the plaintiff. Under such a condition of the evidence and findings, the question suggested is entitled to little consideration. It is proper to state, however, as pertinent to the consideration of certain later acts of the plaintiff, that she had during the seventeen years been introduced by Willard as his wife, and had been understood by friends and acquaintances to occupy that relation toward him. As a matter of fact, at the time plaintiff accepted the proposal of Willard she was married to a man named Harlan and, so far as we are able to determine from the record presented, was never divorced from the latter. At the time first referred to, however, she was living apart from her husband and never thereafter resumed marital relations with him. After the death of C. A. Willard, the son Edgar went to an attorney at law (this according to the testimony of the attorney), where he represented that plaintiff was the widow of his father and that he and the widow were the only heirs. He also made the statement to the attorney of his knowledge as to his father's intention to leave one-half of his estate to the plaintiff, and that he, Edgar, intended to carry out those wishes. It was upon the statement of alleged facts as given by the son Edgar that the attorney drew an application for letters of administration on behalf of the plaintiff and later an application for an allowance to be made to the plaintiff as widow. Both of these applications were presented to the court with the knowledge of the plaintiff, and she testified in verification of the alleged facts therein set forth. Later, however, upon the facts being presented as to plaintiff not being the legal wife of Willard, these proceedings in her behalf were abandoned and no money or property was appropriated by her under any order made therein. Plaintiff testified that she had allowed these proceedings to be taken, affirming her alleged status as the widow of Willard, because of the solicitations of the son Edgar, who persuaded her that everything was all right, that she had always been known as his father's wife, and that it woud save any scandal to have the proceedings gone through with in that way; that she

was influenced further in so doing because of Willard's statement to her that Dorothea was not to receive any part of his property, and that she was innocent of any intent to secure anything from the estate to which she was not entitled. The court made findings upon this matter favorable to the plaintiff in the following terms: "She believed that she and Edgar H. Willard were the sole persons entitled to share in the estate of Charles A. Willard and believed that by doing said acts and things in said estate she would receive only that portion of the estate to which she was entitled under the contract set forth in plaintiff's complaint; that the defendant, Edgar H. Willard, for a long period of time prior to the death of said Charles A. Willard, had known . . . of the existence of the contract alleged in plaintiff's complaint between plaintiff and said Charles A. Willard; that the said Edgar H. Willard advised the plaintiff to apply for letters of administration in said estate, and assisted her in making said application and advised plaintiff that it was proper and for the best interests of said estate that she apply for letters of administration as the widow of said Charles A. Willard and that such action by said plaintiff would prevent unnecessary scandal. That this plaintiff had no intention of deceiving the court in the matter of said estate and had no intention of defrauding said estate or securing a wrong or unlawful advantage against said estate or the heirs of said Charles A. Willard; that plaintiff at no time attempted to secure a larger portion of said estate than one-half thereof and believed that in said proceedings in relation to the probate of said estate she was securing only that part or portion of the estate to which she was legally entitled; that no money was paid to this plaintiff under the order for family allowance; and that she at no time received any money or value under said order for family allowance. That it is not true that the said Mamie E. Harlan was the widow of the said Charles A. Willard, but that this court find that the said representations were not made by the said plaintiff with the express or any purpose or intention of imposing upon the court or for the purpose of gaining for herself an interest in the estate or the assets thereof." [1] Appellants cite a number of cases to the point of their contention, to wit, that where a party has been guilty of an attempt to consummate a

fraud, he will not be heard in a court of equity in any matter concerning the same subject where he seeks relief favorable to himself. Without taking up these cases for the purpose of particular analysis, it may be conceded that they all hold in agreement with a sound doctrine of equitable practice. The distinction important to be drawn between these cases and this is that here, as the evidence showed and the court found, the plaintiff in filing the petition for letters of administration and her application for a family allowance, based upon the claim that she was the widow of Willard, did so without the intent to defraud the estate, or the heirs, of anything. The excuse perhaps showed no legal justification, but even though that be true, the lack of a fraudulent purpose to get something to which she was not legally entitled takes the case without the rule as insisted for by appellant. The contract of 1901 was not obnoxious to the statute of frauds as then existing. The trial judge made a particular finding regarding the agreement under which plaintiff advanced money with which to purchase the lot or build the house occupied by the plaintiff and Willard, in 1910, but we cannot see how that finding affects the judgment, which is based upon the contract asserted by the plaintiff, to wit, that made in the year 1901. The findings of the court as to the material matters involved in the pleadings seem to be within the issues and to sufficiently determine all of these. No error appears requiring that the judgment should be reversed.

The judgment is affirmed.

Conrey, P. J., and Shaw, J., concurred.