[Civ. No. 25323.    First Dist., Div. One.    Mar. 10, 1969.]

FRIEDA WURCHE, Plaintiff and Appellant, v. KARL
STENZEL et al., Defendants and Appellants.

500

Palmer & Grundstrom and Clark M. Palmer for Plaintiff and Appellant.

Freitas, Allen, McCarthy, Bettini & MacMahon and Jay R. MacMahon for Defendants and Appellants.

ELKINGTON, J.—Defendants Karl Stenzel and Heinz Lund have appealed from a judgment, after a court trial, declaring that the administrator of the estate of Gus Stenzel, deceased, holds such estate in trust for plaintiff Frieda Wurche. Frieda Wurche cross-appeals from the judgment insofar as it denies her the "alternative" relief sought for the reasonable value of services rendered the deceased Gus Stenzel during his lifetime.[1]

We state the evidence, as we must, in a light most favorable to plaintiff who prevailed below, giving her the benefit of every reasonable inference and resolving all conflicts in her favor. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; 3 Witkin, Cal. Procedure (1954) Appeal, § 84, p. 2246.)

The decedent Gus Stenzel died intestate on April 8, 1963, at the age of 76 years. He was a native of Germany who had resided in the United States since 1912. Except for a marriage of three years duration, ending in divorce in 1933, he had lived alone. During this time he made several visits to his relatives in Germany. Among these relatives was a niece, plaintiff Frieda Wurche, whose husband had been declared dead; he had never returned from the Russian front in World War II. She and her two children lived with her mother, decedent's sister.

At the end of a visit to Germany in 1953 decedent told Frieda that he hated to go back to his empty house. Soon afterwards he wrote to her saying that he would like to have her with him, that he was old and needed somebody, and that if she took care of him until he died, "everything was left should be mine." An exchange of letters followed, during which Frieda "told him if you like to be with us sell everything and come back here and you can buy a house here and we can live together and he wrote back, no I don't like to be buried in Germany." In the letter exchange she told decedent she was waiting for her husband, "hoping he could come back." Decedent continued in his letters to urge Frieda to come to the United States, saying, "If I am there to care for him what is left shall be mine." In 1955 decedent arranged

[1]Frieda Wurche has filed her appeal "as a precautionary measure to protect her right to consideration of her second count in the event the present judgment should be reversed on appeal." She cites 3 Witkin, California Procedure (1954) page 2229; *Blum* v. *City & County of San Francisco*, 200 Cal.App.2d 639, 648 [19 Cal.Rptr. 574]; *Hager* v. *Hager*, 174 Cal.App.2d 546, 550 [345 P.2d 68], as the reason for her cautionary appeal.

for Frieda to visit him for three months so that she could "look around and see all of the country better." He continued to urge her to move with her children to the United States, saying, "if I come over and take care of him until he dies everything is mine." Frieda decided he needed somebody and told him she would come to live with him and take care of him. They agreed, however, that if her husband should return she would go back to Germany. Otherwise Frieda promised to stay with him until he died. Arrangements were then made ·for decedent to go to Germany the following year and bring back Frieda and her two children.

As arranged in 1956 decedent went to Germany and returned to this country with Frieda and her children. She was unable to speak English at the time. Until his death she lived with decedent; she took care of him during his health and during his illnesses. She performed all of the household duties including the cooking, laundry, cleaning, mending, marketing and gardening. On one occasion decedent took her to the courthouse to show her how to pay taxes, saying "isn't it nice to know this house is yours?" He said when she had the house she would not have to pay rent and she could live on his income of $2,400 from interest and dividends, and that if she didn't "like it here I could sell everything and go back to Germany." On several occasions decedent asked Frieda to marry him. She refused, saying, "I still hoped my husband would come home and there was so many reasons I couldn't marry him." He did, however, give her engagement and wedding rings, the latter to be worn only when and if they got married. He told Frieda that he was going to make a will, but that he was not ready to die and he had plenty of time. He said he didn't need a lawyer; he would write it out himself, thus saving $25. Several weeks after Frieda came to this country the parties commenced sexual relations which continued until decedent's death.

At the trial Frieda's testimony relating to the written (letters) and oral agreements was corroborated. Her daughter testified she had seen the letters of decedent to Frieda stating "If you take care of me until I die I will leave you everything I have." Her son-in-law testified that decedent told him he had given a set of rings to Frieda, that he brought her over to take care of him and that he would take care of her at the end. Decedent's sister, by deposition, testified to letters and oral conversations of decedent in which he said respectively, "Please come abroad, you'll get everything" and "I would

like you very much to come to America, even if your husband comes everything can be settled, and in case I should die sometime you'll get everything.'' Decedent's sister-in-law deposed to a conversation between decedent and Frieda in which he said, ''If you will look after me until I die and take care of me, you will be taken care of until you die.'' And Herr Grundke, a brother of Frieda, in his deposition, said: ''I always spoke with my uncle about this matter because I didn't want my sister to be unhappy over there and my uncle always said he was afraid of getting old and as medical service is not arranged the same way as in Germany, not socially arranged, he too thought that once he had to go to hospital all his money would be spent for the hospital treatment and he would lose all the money he had saved up. Well, I think and then he agreed with my sister that she should take care of him and he even said that the person who was going to take care of him until he died should get his property. Q. Now [have you] heard Gus Stenzel say this? A. That he told me personally.'' The letters in which decedent stated that he would leave all of his property to Frieda if she took care of him until he died were not retained and accordingly were not offered in evidence at the trial.

After trial the court found and concluded in part as follows: ''1. Plaintiff and decedent entered into valid contracts whereby plaintiff agreed to live with decedent in a family relationship and give him care and affection for the rest of his life and decedent in consideration thereof agreed to leave plaintiff his entire estate at his death.

''2. Plaintiff fully performed said contract on her part, but decedent breached it by failing to leave plaintiff his estate.

''3. Said contract was fair, definite and certain and supported by adequate consideration.

''4. Said contract was not contrary to good morals and was not against public policy.

''5. Enforcement of the contract would not be harsh, oppressive or unjust to innocent third parties.

''6. The services promised and performed by plaintiff were unique and not susceptible of pecuniary compensation. Plaintiff has no adequate remedy at law, and decedent's agreement should be specifically enforced.

''7. Plaintiff made a detrimental change of position in reliance on the agreement and would suffer unconscionable injury if decedent's promise were not enforced. Defendants are estopped to assert the bar of the statute of frauds.

"8. Decedent's letters constituted memoranda which removed the contract from the statute of frauds."

The first assignment of error of appellants-defendants is that the agreement is uncertain and indefinite.

We find the contention to be without merit. Simply stated, the decedent agreed that if Frieda would come to this country and take care of him for the rest of his life he would upon his death leave his entire estate to her. The trial court's conclusion that the agreement was fair, *definite and certain* was supported by the evidence, and the findings made thereon. Substantially similar agreements were upheld in *Jones* v. *Clark,* 19 Cal.2d 156 [119 P.2d 731]; *Davis* v. *Jacoby,* 1 Cal.2d 370 [34 P.2d 1026]; *McCabe* v. *Healy,* 138 Cal. 81 [70 P. 1008], and *Riganti* v. *McElhinney,* 248 Cal.App.2d 116 [56 Cal.Rptr. 195].

The cases upon which defendants rely are factually distinguishable and wholly inapplicable. *Smith* v. *Smith,* 126 Cal. App.2d 194, 197 [272 P.2d 118]; *Kurtz* v. *de Johnson,* 42 Cal.App. 221, 228 [183 P. 588], and *Parsons* v. *Cashman,* 23 Cal.App. 298, 301 [137 P. 1109, 1111], involved indefinite terms of service, terminable at the plaintiff's whim, which deprived the contracts of adequate consideration. In *Hoxsie* v. *Clark,* 234 Cal.App.2d 370, 374-375 [44 Cal.Rptr. 399], and *Beach* v. *Arblaster,* 194 Cal.App.2d 145, 162-163 [14 Cal.Rptr. 854], the decedent's promises to "take care of" or "to provide well" for the plaintiff by will were so obviously vague as to be totally incapable of enforcement. In *Owens* v. *McNally,* 113 Cal. 444, 451-454 [45 P. 710, 33 L.R.A. 369], the alleged oral contract lacked specification as to its duration, was vague in several other particulars, and would have been oppressive on decedent's widow had it been specifically enforced.

Defendants further argue that since decedent was free at any time to terminate the agreement and send Frieda back to Germany if for any reason he did not like her, the agreement was uncertain. The evidence does not support this assertion. Frieda's testimony was that, "We didn't agree in Germany if he doesn't like me to send me back, no. I promised to take care of him." She did state to decedent, however, that "if he didn't like it any more to say so and we can go back." This language, reasonably construed, was at most an offer to rescind the agreement if decedent were dissatisfied with the arrangement. There is no evidence that this offer was accepted. Defendants seize upon a certain statement of Frieda

that "if I had enough to live on he could give [to] other people too," which it is argued left decedent's obligation fatally uncertain. The context from which this statement was uprooted makes abundantly clear her intended meaning, that if decedent had left her sufficient property on which to live she would not have contested his disposition; "but if I don't be satisfied I would—I would go to court."

The next assignment of error is that the trial court's findings are not supported by the evidence.

In support of this contention defendants state *"There is clearly substantial evidence to support that finding* [of the existence of a contract]. However, there are just as clearly numerous inconsistencies and contradictions." (Italics added.) We must on this appeal, as stated *ante,* resolve any inconsistencies and contradictions in the evidence in favor of the party who prevailed below, here the plaintiff Frieda Wurche.

It is urged that evidence of a contract such as that here at issue must be more than substantial; it must be "clear and convincing." It is the law that whether evidence meets the "clear and convincing" test is exclusively a matter for the determination of the trier of fact. Since the trial court, upon conflicting evidence, made such a determination the question is now closed on appellate review. (*Beeler* v. *American Trust Co.,* 24 Cal.2d 1, 7 [147 P.2d 583].)

Next it is urged that because of the sexual relations between Frieda and the decedent their contract is contrary to good morals and public policy. There is no evidence whatever that this relationship was in any way consideration for the agreement. Under similar factual circumstances the court in *Harlan* v. *Willard,* 52 Cal.App. 194, 196-197 [198 P. 424], held such a contention to be "entitled to little consideration." The trial court here found "A sexual relationship developed between decedent and plaintiff about four weeks after her arrival in 1956, but it was not a consideration for decedent's promise to leave plaintiff his estate and had not been within the plaintiff's contemplation at the time their contract was entered into. This relationship lasted until decedent's death." There was no error in the trial court's conclusion that the contract was "not contrary to good morals and was not against public policy."

Finally defendants contend that Frieda "is adequately compensated by her adequate remedy at law." Here

it is argued that if the court had awarded her $24,300 on her complaint's count for the reasonable value of her services, such sum, when added to her mother's share of the estate, which was assigned to Frieda, would give Frieda, now 58, "enough to live on." This contention, which is unsupported by authority, we find to be without merit.

The judgment is affirmed. Each of the parties will bear his, or her, own costs on appeal.

Molinari, P. J., and Sims, J., concurred.