[No. B084128. Second Dist., Div. Four. July 25, 1996.]

DESIDERIO MAGPALI, Plaintiff and Appellant, v.
FARMERS GROUP, INC., et al., Defendants and Respondents.

472

COUNSEL

Perona, Langer & Beck, Major Alan Langer, Ellen R. Serbin and E. Todd Trumper for Plaintiff and Appellant.

Tharpe & Howell, Christopher S. Maile and David B. Wasson for Defendants and Respondents.

OPINION

BARON, J.—Appellant Desiderio Magpali brought suit against Farmers Group, Inc., Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, Farmers New World Life Insurance Company, Shel Chaffer, Norman Gerwien, and Joe Lowther (collectively referred to herein as Farmers) for breach of contract, fraud, and intentional infliction of emotional distress arising out of his tenure as an insurance agent for Farmers. The breach of contract claim was dismissed prior to trial and the court granted Farmers' motion for nonsuit as to the other two claims. On the eve of trial, Magpali sought and was denied leave to amend to add a claim for violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq., hereinafter referred to as the Act). We affirm.

PROCEDURAL AND FACTUAL BACKGROUND

*The Pleadings*

In his complaint, filed July 15, 1992, Magpali alleged causes of action based on breach of contract, fraud and intentional infliction of emotional

distress. The complaint alleged that he had been an agent for Farmers since 1984 and that Farmers breached the parties' agreement on or about April 17, 1989, by "placing Magpali on Limited Underwriting Authority ('LUA') status, effective May 1, 1989," which "result[ed] in severe restrictions being placed upon the agent's ability to bind Farmers policies." The complaint further stated that Farmers breached the agreement "by telling Magpali how to run his business and requiring him to submit a plan of operation for Farmer[s's] approval" and "by terminating the [agreement] without good cause . . . ."

Concerning the fraud claim, the complaint alleged that in July of 1984 and April of 1985 Farmers made the following misrepresentations: "(a) As a Farmers' agent Magpali would be an independent contractor and as such, he would be able to determine the time in which he would carry out his business; [¶] (b) That Magpali would be free to determine [the] manner in which he conducted his business; [¶] (c) That Magpali would be free to make all decisions regarding the operation of his business as long as he performed his duties under the Appointment Agreement; [¶] (d) That Magpali would be allowed to market policies to any and all interested applicants; and [¶] (e) That Magpali would be free to deal with applicants regardless of racial background or nationality." According to the complaint, the truth was that Farmers "intended to, and did: [¶] (a) Require that Magpali spend certain parts of each day and night soliciting new business; [¶] (b) Impose requirements on Magpali regarding the manner in which he operated his business; [¶] (c) Require that Magpali submit a plan of operation to Farmers which was subject to Farmers approval; [¶] (d) Place Magpali on LUA status and preclude him from binding most types of Farmers policies, and, in some cases, from even submitting an inquiry to Farmers regarding an application; and [¶] (e) Order Magpali to sell policies to applicants who were not Filipino or Hispanic."

In support of the claim for intentional infliction of emotional distress, Magpali alleged that between July 1991 and February 1992, Farmers' representatives: (a) "yelled that Magpali's record was the worst . . . ever[] seen and that Magpali should resign"; (b) "told Magpali that he was writing to[o] many policies for minorities and that he should write more policies for 'white people' or resign"; (c) "insulted, belittled, and shouted at Magpali and threatened to terminate him in an effort to get him to resign"; (d) "shouted at Magpali that he had no future with Farmers, that he should avoid writing Filipinos and Hispanics and that he should resign"; and (e) "force[d] Magpali, without any preparation, to do a mock sales presentation" and "told Magpali he was doing a lousy presentation and . . . was otherwise degrading and insulting to Magpali."

A demurrer to the complaint was overruled in all relevant parts. In its answer, Farmers contended that Magpali's claims for fraud and intentional infliction of emotional distress were barred by the relevant statutes of limitations. A motion brought by Farmers for summary judgment was denied.

Trial was set for March 2, 1994, and trailed until March 11, 1994. Magpali informed Farmers by letter dated March 8, 1994, that he intended to amend his complaint to bring a claim under the Act. He filed a motion for leave to amend on March 10. The court denied the motion on the first day of trial. Magpali dismissed the action for breach of contract during the argument on motions *in limine*.

### Evidence at Trial

Accepting as true the evidence introduced by Magpali, he was recruited to become a Farmers insurance agent by John Cammeraat. Cammeraat told him at their first meeting that being a Farmers agent was an opportunity to be independent and to have his own business and earn unlimited income. Magpali believes he indicated to Cammeraat that his natural market was the Filipino community.

Magpali became a reserve agent in July of 1984, which means he began selling insurance part time while holding on to his existing job with a company called Zeus West, Incorporated. Between July of 1984 and April of 1985, he received training classes but no specific training on limited underwriting authority (LUA) or the calculation of loss ratio. Farmers maintains a manual or guide for its agents which discusses LUA status and how it is attained. It states: "When the 4th quarter Experience Analysis reports are published each year, all Agents are evaluated to determine their status for the subsequent year. [¶] . . . . [¶] [The LUA] designation will apply to those Agents who have an underwriting loss of over 10% and $60,000 or more during the past 36 months, ending December 31st, regardless of policy-in-force. [¶] Limited Underwriting Agent may not bind risks in Farmers Auto." Magpali could not remember when he received his own copy of the agent's guide, possibly not until he became a full-time agent. However, he was required to study the guide as part of his training and had access to a copy of the guide located in the office in which he worked.

In April of 1985, Magpali signed an agent appointment agreement and became a full-time agent for Farmers, quitting his job with Zeus West. The agreement provided that "[t]he Agent shall, as an independent contractor, exercise sole right to determine the time, place and manner in which the

objectives of this Agreement are carried out, provided only that the Agent conform to normal good business practice, and to all State and Federal laws governing the conduct of the Companies and their Agents." The agreement stated that it could be terminated by either party "on thirty (30) days written notice," which would suggest that it could be terminated with or without cause. However, there is no dispute that Farmers' practice was to terminate agency agreements only for cause.

Magpali first recalls hearing about the LUA program in 1986 or 1987 when an agent in his office was placed in it. In addition, it was his understanding from studying the agent's guide that one of Farmers' objectives for its agents was that they have a profitable loss ratio. He received quarterly loss ratio reports from the time he became a career agent. He was expressly informed that he was having a loss ratio problem in 1988 when he received a memorandum from Cammeraat listing the weaknesses in his agency, including "low production" and "loss ratio 172.7%." The memorandum instructed him to "be prepared to discuss the contents of this memo and present your development plans" at their next meeting. Magpali believed that the problem was caused by some of his clients' lying about their driving records. He prepared a response for Cammeraat in which he listed a number of actions he intended to undertake to improve his statistics.

Magpali received notice on April 17, 1989, that due to his loss ratio he would be put in the LUA program. The most significant result of this designation was that Magpali no longer had authority to bind the company when clients sought the low cost automobile policy designed for preferred risks unless he had a motor vehicle report, photographs of the car, and a copy of an existing insurance policy. At a meeting held shortly thereafter, he was told to correct the loss ratio problem by expanding his book of business outside the Filipino and Hispanic communities. In a memorandum from the regional sales manager which followed the meeting, he was instructed to "develop your plans, including quantitative goals, which you will work in order to return your Agency to profitability, by year-end."

The loss ratio situation did not improve. Effective May 1, 1990, the LUA status was renewed. A year later, in May of 1991, he was designated a LUA agent for the third year in a row.

At a meeting which followed the May 1991 LUA designation, Magpali was told his record was the worst ever seen and urged to resign. About a month later he met with his district manager and was again urged to resign and told to avoid writing Filipinos and Hispanics because they were giving him the loss ratio problem. He was required to do a mock sales presentation

which was pronounced "lousy." At that meeting, he informed Farmers he would not change any practices unless the request was put in writing. Afterwards, he contacted a lawyer who sent a letter dated July 9, 1991, to Farmers, stating: "We were informed by our client that recently he has been the subject of harassment, threats, intimidation, insults and racial discrimination as evidenced by various written memoranda as well as verbal confrontations. [¶] . . . . [¶] [W]e were informed by our client that he was verbally given notice that he cannot get customers who have Filipino and Hispanic origin." After sending the letter, Magpali decided not to attend further meetings. In December, his lawyers sent a letter outlining a marketing program "to resolve the alleged deficiencies existing in our client's agency" and agreeing to a meeting in January.

In January of 1992, Magpali met with Farmers accompanied by his lawyer to discuss his proposal. On February 4, 1992, he was called to another meeting and was given notice of termination. No one spoke aggressively or improperly to him at those times. At the final meeting he was told that Farmers had only wanted him to expand his marketing efforts and that he had been free to sell to whatever nationalities he desired.

During his seven-year career with Farmers, Magpali's principal source of new business was through friends, acquaintances, and referrals from existing clients. He was earning about $15,000 to $20,000 in commissions by his fourth year. Throughout the years of criticism of his performance, he never changed his marketing practices. He continually refused to attend meetings and classes scheduled by Farmers for its agents.

Farmers's "official nondiscrimination policy" as set forth in the agent's guide stated: " '[A]ll Farmers Insurance Group of Companies policies and coverages are offered to the public on a nondiscriminatory basis and are underwritten without regard to sex, race, religion, religious creed, color, national origin, ancestry [sic] or geographic area. [¶] Any solicitation or maintenance of business should be based on nondiscriminatory consideration in accordance with our established policy.' " A 1984 memorandum to Cammeraat referencing Magpali stated: "We have approved the Agent prospect appointment. However, the reserve appointment and attainment of qualifying production count for career conversion will not result in automatic conversion. [¶] All writings under the reserve contract will be reviewed before conversions for: [¶] desirable source and method of acquisition, broad based solicitation not confined to ethnic community, religious or other groups, adequate communication skills to enable proper servicing of the account, use of proper qualification techniques to enable the accurate administration of risk placement, classification and discount programs, forms completion, ability to pay and renew."

Magpali testified that if he had known about his potential problems with loss ratio, the LUA program, or the need to avoid writing insurance solely to Filipino and Hispanic clients, he would not have given up his job with Zeus West to become a Farmers agent.

After hearing plaintiff's side, the trial court granted a defense motion for nonsuit. In its order, the court made the following rulings based on the evidence presented: that Farmers did not perpetrate a fraud on Magpali; that the fraud claim was barred by the statute of limitations; that Farmers' conduct was not outrageous; and that the claim for intentional infliction of emotional distress was barred by the statute of limitations. Magpali appealed from the judgment following the grant of nonsuit.

DISCUSSION

I

*Fraud*

We first address the issue of whether Magpali's claim of having been fraudulently induced to become a Farmers insurance agent was supported by substantial evidence and should have been permitted to go to the jury. There is no doubt that the allegations of the complaint that Farmers induced Magpali to become one of its insurance agents by fraudulent representations stated a cause of action. The Supreme Court has held that where an employer uses misrepresentations to induce a party to change employment when the objective could not have been achieved truthfully, and the party is left in worse circumstances than those in which he would have found himself had he not been lied to, he has a claim for promissory fraud or fraud in the inducement. (*Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 638-643 [49 Cal.Rptr.2d 377, 909 P.2d 981].) Although Magpali was an independent contractor, not an employee, we see no reason why the same principle would not apply.

Magpali's fraud claims can be broken down into three broad categories: (1) Farmers falsely represented that Magpali would be permitted to run his office as he saw fit; (2) Farmers concealed the existence of the LUA program under which agents were limited in their ability to bind insurance; and (3) Farmers falsely represented that Magpali could sell insurance to members of any racial or ethnic group without revealing the existence of an "unwritten policy" precluding an agent from dealing exclusively with particular racial or ethnic groups. We address each category separately.

## A

According to the undisputed evidence, Magpali always ran his office in accordance with his own practices, and never submitted to Farmers' directives, whether they came under the guise of advice, instructions, or orders. ■ We presume, therefore, that when Magpali says Farmers falsely promised to allow him to run his office as he saw fit, he means that Farmers falsely represented he could run his office as he saw fit and not be terminated or threatened with termination. We agree with the trial court that there was no merit to the claim.

A promise of future conduct is actionable as fraud only if made without a present intent to perform. (Civ. Code, § 1710, subd. 4; *Tarmann* v. *State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158-159 [2 Cal.Rptr.2d 861].) " 'A declaration of intention, although in the nature of a promise, made in good faith, without intention to deceive, and in the honest expectation that it will be fulfilled, even though it is not carried out, does not constitute a fraud. [Citation.]' " (*Edmunds* v. *Valley Circle Estates* (1993) 16 Cal.App.4th 1290, 1301 [20 Cal.Rptr.2d 701], quoting *Church of Merciful Saviour* v. *Volunteers of America* (1960) 184 Cal.App.2d 851, 859 [8 Cal.Rptr. 48].) Moreover, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' [Citations.] . . . [I]f plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury." (*Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 30-31 [216 Cal.Rptr. 130, 702 P.2d 212].)

The evidence was uncontroverted that for years after Magpali became a full-time insurance agent, Farmers did not interfere with his operations in any way and that Magpali ran his office as he thought best. This led to very low income for him and little or no profit for Farmers. It was only after multiple years of disappointing sales and a higher than average loss ratio, that he was instructed to try different marketing techniques.

On these facts, there was simply no evidence to support the claim the alleged promise was false when made. Farmers could not have foreseen that Magpali would be unable to profitably operate the agency at the time the contract was made and therefore could not have known that the alleged promise of noninterference was false when made. Farmers may have been overly optimistic in believing that an inexperienced agent could generate sufficient sales to justify the continued operation of the agency, but an erroneous belief, no matter how misguided, does not justify a finding of fraud. (See *Tarmann* v. *State Farm Mut. Auto. Ins. Co., supra,* 2 Cal.App.4th

at p. 159 ["[M]aking a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise. [W]e decline to establish a new type of actionable deceit: the negligent false promise."].)

We further agree with the trial court that this claim is barred by the applicable statute of limitations contained in Code of Civil Procedure section 338, subdivision (d). Certainly by no later than May of 1989, by which time Magpali had been designated an LUA agent, restricted as to the types of insurance he could bind, forced to defend his operating and marketing practices, and ordered to develop a plan to return his agency to profitability by year's end, he had notice that he would be operating under less than the absolute freedom he asserts was his due. His complaint was not filed for more than three years.

### B

Magpali's primary contention concerning the LUA program is that Farmers wrongfully concealed its existence from him and thereby induced him to become a Farmers agent. Ordinarily, failure to disclose material facts is not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 346-347 [134 Cal.Rptr. 375, 556 P.2d 737]), and an insurer does not owe a fiduciary duty to its agents. "The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff. [Citations.]" (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 700, p. 801; accord, *Goodman* v. *Kennedy*, *supra*, at p. 347.) Here, the agent's guide which explained the LUA program was completely accessible to Magpali before he left his prior occupation to become a full-time agent; indeed he was expected to study it as part of his training.

Moreover, to be actionable, a misrepresentation or concealment must induce justifiable reliance and resulting damage. (*Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 17 [147 Cal.Rptr. 655], disapproved on another ground in *Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763].) Magpali contends concealment of the LUA program induced him to become a Farmers agent and the resulting damage was the loss of the existing, more secure position with Zeus West. But under any view of the facts, Magpali knew his future as a salesman for Farmers was uncertain and depended on his ability to engender profit for the company. Magpali could not have reasonably expected that he would be permitted to run an unprofitable agency forever in light of the fact the

parties' agreement included a requirement of conformance to normal good business practices and a right of termination for cause. Put another way, the evidence was uncontroverted that he willingly gave up a secure job and became a Farmers agent with the understanding that Farmers could terminate him for failure to make sufficient sales. Since that is the case, we fail to see how the alleged concealment of the fact that Farmers had a program for low-producing agents far less drastic than outright termination could have had any effect on his decision to become a Farmers agent.

■ This aspect of the fraud claim also suffers from an insurmountable statute of limitations problem. Assuming that Farmers had a duty to disclose the LUA program and that concealment of the program induced Magpali to become a Farmers agent, the evidence was uncontroverted that Magpali knew about the program by no later than April of 1989, when he received notice that he was going to be designated an LUA agent due to his excessive loss ratio. Magpali suggests that this event did not trigger the statute because he believed the status was only temporary. This belief made no difference to the running of the statute of limitations, which accrues when the plaintiff has all the information essential to the claim. (*Spellis* v. *Lawn* (1988) 200 Cal.App.3d 1075, 1080 [246 Cal.Rptr. 385].) Magpali's claim was that he was wrongly induced to become a Farmers agent by concealment of the LUA program. By April of 1989 at the very latest, he was informed of the existence of the allegedly concealed program and its effect on his ability to sell Farmers insurance. He had already left his position with Zeus West, suffering the alleged damage. Since he did not file the complaint until July of 1992, more than three years later, the claim was barred.

## C

■ We next turn to Magpali's contention that Farmers engaged in fraudulent concealment because it represented that "Magpali would be free to deal with applicants regardless of racial background or nationality" and "never told Magpali about its unspoken policy prohibiting agents from marketing in any one specific ethnic group."[1] While it is somewhat out of the ordinary to assert a claim of fraud where the defendant's transgression

---

[1] Magpali in his brief on appeal states that Farmers never told him that "agents who wrote heavily in one ethnic group were likely to end their career with Farmers because the 'ethnic group' would mean high loss-ratios for the agent." Certainly, Magpali cannot be suggesting that Farmers should warn members of various ethnic groups not to become Farmers agents because members of their group have excessive losses. It would violate public policy—and laws prohibiting discrimination—for Farmers to make any such statement to prospective agents. Likewise, Magpali suggests that he should have been warned that "it was extremely difficult and/or virtually impossible for a minority agent selling to a minority community to get off LUA." Since it would be wholly improper and a violation of public policy for an

involves discriminatory conduct, there is no principle which impedes a claimant from asserting such a claim as long as all the elements are present. The elements of fraud are "(a) misrepresentation . . . ; (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage. [Citations.]" (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 676, p. 778.) Magpali alleged that Farmers had a policy of prohibiting agents from selling to certain ethnic groups, including their own, but told Magpali that he would be free to market to all applicants regardless of ethnicity in order to induce Magpali to become a Farmers agent. That would appear to meet all of the necessary elements of a claim for fraudulent misrepresentation. Unlike a claim for discrimination, however, the damages do not arise from the loss of the position with Farmers, as Magpali suggests in his brief, but from the loss of the previously held position which the agent was induced to leave. (See *Lazar* v. *Superior Court*, *supra*, 12 Cal.4th at pp. 642-643.)

The choice to transmute a discrimination claim into one for fraud does lead to a potential limitations problem. The fraud claim is a backward looking one in that the tort of fraud in the inducement is complete the moment the plaintiff suffers reliance damage by leaving his previous employment. The only reason the statute of limitations does not accrue immediately is that plaintiff is presumably ignorant of the fraud at that point. (See Code Civ. Proc., § 338, subd. (d) [". . . The cause of action [for relief on account of fraud or mistake] is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."].) Once the plaintiff obtains the requisite knowledge, the statute begins to run. Put in terms of the present complaint, the crucial event for accrual purposes is the occasion on which the plaintiff first learns of the allegedly discriminatory policy, not the date on which he is terminated. Nor does it begin running anew every time the discriminatory policy is mentioned or emphasized.

According to Magpali's testimony, he was placed on LUA status and told he must expand his book of business outside the Filipino and Hispanic communities in May of 1989. This was the crucial date for statute of limitations purposes on his claim for fraud in the inducement based on any misrepresentations made by Farmers concerning the alleged policy of discrimination. On that date, every element of the cause of action was in place, including damages, and he had actual knowledge that the sales policy was otherwise than he had been informed. "Once a plaintiff suspects wrongdoing

---

insurance company such as Farmers to instruct a minority agent outright to stop selling insurance to any ethnic group, it would be equally improper to indirectly discourage such sales under the guise of "explaining" that that would be the only way to come off LUA status.

and therefore has an incentive to sue, he or she must decide whether to file suit or sit on his or her rights. When a suspicion exists, the plaintiff must go find the facts; he or she cannot wait for the facts to find him or her. [Citations.]" (*San Francisco Unified School Dist.* v. *W.R.Grace & Co.* (1995) 37 Cal.App.4th 1318, 1327 [44 Cal.Rptr.2d 305].) The parties place undue emphasis on the question of whether Magpali was told to "expand" his efforts outside the Filipino and Hispanic communities or "avoid" writing policies in these communities in May of 1989. Either way, the message that Magpali had too many clients of certain ethnic groups was obvious. Reading the evidence most favorably toward Magpali, it is undisputable that he had sufficient reason to suspect the existence of a policy of discrimination in May of 1989, yet sat on his rights for over three years. As a result, the claim of fraud based on misrepresentations concerning the nondiscrimination policy was barred by the applicable three-year statute of limitations, as the trial court found.

II

*Intentional Infliction of Emotional Distress*

The trial court concluded that none of the conduct attributed to Farmers constituted extreme and outrageous conduct and that in any event the claim was barred by the one-year statute of limitations. We question one aspect of this finding. ■ The reported instructions to write more insurance policies to nonminorities and to avoid writing policies for members of Magpali's own ethnic group because they were poor risks could constitute the extreme and outrageous conduct needed to support the tort under current law. (See *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 947 [160 Cal.Rptr. 141, 603 P.2d 58] [use of racial epithet with intention to inflict emotional distress followed by termination of employment outrageous]; *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498 [86 Cal.Rptr. 88, 468 P.2d 216] [insulting plaintiff's race for the purpose of causing plaintiff to suffer emotional distress in conjunction with wrongful termination of employment sufficient to state claim for intentional infliction of emotional distress].)

But even if the statements reported by Magpali supported the claim, the cause of action was time-barred. A claim for intentional infliction of emotional distress is governed by the one-year statute of limitations for intentional torts. (Code Civ. Proc., § 340, subd. (3); *Murphy* v. *Allstate Insurance Co.* (1978) 83 Cal.App.3d 38, 50 [147 Cal.Rptr. 565].) The last purported comment of a racially denigrating nature was made in the month before Magpali's attorney's letter of July 9, 1991. The complaint was not filed until July 15, 1992.

## III

### *Unruh Civil Rights Act Violation*

■ Magpali was denied permission to amend his complaint to bring a claim under the Unruh Civil Rights Act. (Civ. Code, § 51 et seq.) Magpali did not include an Act claim in his original complaint, but sought leave to amend on the eve of trial to add such a claim based on the allegation that "he was specifically told to avoid writing Hispanics and Filipinos . . . and that his refusal to follow Farmer[s's] orders was a substantial factor in causing his termination." The trial court denied leave. The question raised is whether the court abused its discretion. We take particular care in reviewing this ruling because of two comments made during the course of the trial. During argument over admission of a videotape, Magpali's counsel stated: "[Magpali] happens to be a minority agent who deals in a minority market, and that is precisely . . . what this case is about." To this the court replied: "I'm [of] German descent. I suppose I'm a minority too, huh?" Later, in a discussion of whether defense counsel had opened the door to letting the same videotape into evidence because of remarks made during his opening statement, the court commented: "According to the opening statement of the defense, they say that we can show that his partner who obviously is a minority, too,—I don't know who isn't a minority anymore,. but I would guess he would fall in the class of a minority—he got off [LUA], if that's what's going to be shown." These remarks created an appearance of insensitivity to the real burdens posed by discriminatory treatment toward certain ethnic groups in this society, and cannot be ignored. "The day is long past when appellate courts can disregard judicial action rooted in racial or sexual bias as harmless error [citation]. [¶] ' "[T]he trial of a case should not only be fair in fact, but it should also appear to be fair." ' [Citations.]" (*In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1499-1500 [15 Cal.Rptr.2d 70], quoting *Webber* v. *Webber* (1948) 33 Cal.2d 153, 155 [199 P.2d 934] and *Pratt* v. *Pratt* (1903) 141 Cal. 247, 252 [74 P. 742].)

Nevertheless, our independent review of the record reveals no abuse of discretion in the denial of the request for leave to amend. Magpali's amendment was proposed on the eve of trial, nearly two years after the complaint was originally filed. He did not give an explanation for leaving the Act claim out of the original complaint or bringing the request to amend so late. "A party who waits 18 months before attempting to amend, and then does so only after trial has commenced, and who offers no excuse for the failure, can hardly complain when the request to amend is denied." (*City of Stanton* v. *Cox* (1989) 207 Cal.App.3d 1557, 1564 [255 Cal.Rptr. 682].) In addition, prejudice to Farmers was clearly shown because in preparing for trial on

claims of breach of contract, misrepresentation, and intentional infliction of emotional distress, it had not discovered or deposed many of the witnesses who would support the new allegations, and had not marshaled evidence to oppose the contention that a systemwide discriminatory policy existed. Although courts are bound to apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial (see, e.g., *Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 296-297 [216 Cal.Rptr. 443, 702 P.2d 601]; *Higgins* v. *Del Faro* (1981) 123 Cal.App.3d 558, 564 [176 Cal.Rptr. 704]; *Hirsa* v. *Superior Court* (1981) 118 Cal.App.3d 486, 488-489 [173 Cal.Rptr. 418]), this policy should be applied only "[w]here no prejudice is shown to the adverse party . . . ." (*Higgins* v. *Del Faro, supra,* at p. 564.) A different result is indicated "[w]here inexcusable delay and probable prejudice to the opposing party" is shown. (*Estate of Murphy* (1978) 82 Cal.App.3d 304, 311 [147 Cal.Rptr. 258].) In *Murphy*, ". . . the proposed amendment opened up an entirely new field of inquiry without any satisfactory explanation as to why this major change in point of attack had not been made long before trial." (*Ibid.*) Under those circumstances, denial of leave to amend was appropriate.

Magpali admitted at oral argument that his Act claim depended on witnesses who had not been identified or deposed prior to the time of trial. He expected to call Farmers agents Tony Carungay and Ruby Ilao who he represented would testify that they were told not to write Hispanics or Filipinos and Paul Krieger, an ex-Farmers agent, who Magpali represented was instructed not to write Blacks or Hispanics and not to write any business south of the 605 Freeway. He proposed to show the jury a videotape on which Farmers employee Debbie Settles purportedly discussed the difficulty of getting off LUA status as a minority selling in minority communities. He also wanted to introduce maps showing the location of Farmers agents, and Bruce Broadwater, who prepared the maps, would be called reportedly to testify concerning the paucity of agents in certain minority occupied areas. Krieger, Settles, and Broadwater had not been identified in discovery or deposed. None of these witnesses or documents had been identified in response to an interrogatory seeking to discover the support for the allegation that Farmers ordered Magpali to sell policies to applicants who were not Filipino or Hispanic, although Carungay and Ilao had been mentioned in Magpali's deposition.

It is apparent that adding the new cause of action would have changed the tenor and complexity of the complaint from its original focus on representations and demands made to Magpali by his superiors to an exploration of Farmers's activities and practices in the entire Southern California area. Magpali conceded at oral argument that addition of the new claim would

have necessitated, at the very least, a continuance to allow Farmers to depose new witnesses. Where the trial date is set, the jury is about to be impaneled, counsel, the parties, the trial court, and the witnesses have blocked the time, and the only way to avoid prejudice to the opposing party is to continue the trial date to allow further discovery, refusal of leave to amend cannot be an abuse of discretion. Our concern over the unfortunate remarks appearing in the record does not persuade us otherwise. With every relevant factor aligned on the opposing side, denial of the motion for leave to amend was the only appropriate outcome.

DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied August 20, 1996.