Filed 5/23/13  Marriage of Bradley and Lind CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re the Marriage of WILLIAM ROBERT BRADLEY and BEATRIZ LAURENTINA LIND. | |
| | D059945 |
| WILLIAM ROBERT BRADLEY, | |
| Respondent, | (Super. Ct. No. DN131119) |
| v. | |
| BEATRIZ LAURENTINA LIND, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard G.

Cline, Judge.  Affirmed.

Kehr, Schiff & Crane and Joe Schiff for Appellant.

Trope & DeCarolis and Patrick DeCarolis, Jr., for Respondent.

This action involves the interpretation of language in paragraph 7.4.1 of a

premarital agreement between appellant Beatriz Laurentine Lind (Laura) and respondent

William Robert Bradley (Robert)[1] that detailed the parties' rights regarding certain real property owned by Robert.

The premarital agreement also provided that Laura would receive $3 million from Robert shortly after the marriage. Approximately six months after the parties married it was decided that a house would not be built on the property described in paragraph 7.4.1.

Robert filed an action for martial dissolution in December 2003.

Thereafter, Robert brought a motion for summary adjudication seeking to have the property located on Camino Sierra del Sur in Rancho Santa Fe (the Rancho Santa Fe property) declared to not be the joint residence and for a finding that Laura was not entitled to any money or damages from the sale of property located on Tierra Del Sur in San Diego (the Tierra Del Sur property). The motion for summary adjudication was denied and the case was thereafter set for trial.

Prior to the commencement of trial, both parties filed motions in limine regarding the admissibility of parol evidence to interpret paragraph 7.4.1. Robert sought to prohibit the use of parol evidence in construing that paragraph. Laura's motion in limine argued that (1) the disputed provision of the premarital agreement was unclear and ambiguous, and (2) therefore parol evidence should be admitted.

---

[1]     We refer to the parties by their middle names as they do themselves. We intend no disrespect.

The trial court granted Robert's motion in limine, finding that "[t]he agreement is clear and unambiguous. Extrinsic evidence is barred with regard to the intentions of the parties expressed in [paragraph] 7.4.1 of the prenuptial agreement."

Once the court ruled on these motions in limine, Laura sought to have the judge who heard Robert's motion for summary adjudication rule on the motions in limine (the case had been reassigned for trial). The court denied this request.

On appeal, Laura asserts that (1) parol evidence should have been admitted consistent with the court's order denying Robert's summary judgment motion; and (2) the court did not comply with the procedural mandates applicable to reexamination of Robert's motion for summary judgment. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Laura and Robert married on July 30, 1999. Robert filed for dissolution of the marriage on December 31, 2003.

A. *Facts Occurring Prior to Marriage*

In May 1998 Robert purchased the Tierra Del Sur property, with title taken in the name of "Via Del Mar, LLC," a limited liability company formed by Robert for the purchase.

On July 28, 1999, the parties entered into the premarital agreement. Laura had at least two different attorneys representing her in connection with drafting of the premarital agreement and there were "many" drafts of the premarital agreement before it was signed by the parties.

3

The premarital agreement provided that all property acquired prior to or during the parties' marriage would remain the separate property of the person acquiring it except as expressly provided otherwise in the premarital agreement. The only exception was paragraph 7.4.1 which describes the "Joint Residence" as the Tierra Del Sur property and provides as follows: "Upon the marriage of the Parties, Robert shall transfer into the joint names of the Parties the real property described in Exhibit D (hereinafter the 'Residence' or 'Joint Residence'). [Laura] shall designate how she will hold title to her interest in the Residence (however, she may not hold title as a joint tenancy). It is Robert's and [Laura's] *intention* that a home will be built on this property in which they both shall live - although the Parties have looked at and are considering other places to purchase a home. The Parties will each have input with regard to the operations of the Residence, and the Parties will consult with one another on all major issues regarding the residence, but Robert will make the ultimate decisions. [¶] Presently, Robert has invested $1,035,647.63 in purchasing the real property for the Residence. In the event Robert (or his estate) exercises any right to acquire [Laura's] interest in the Residence, or upon sale or other disposition of the Residence, Robert shall either receive a credit against any payment due to [Laura] or her estate (e.g., in connection with any payments due under Sections 6.3 of 7.4.3), or shall be reimbursed the amount he has invested [in] said Property, from any sale proceeds. [Laura] has the right at any time to acquire one-half of Robert's equity in the land by paying Robert one-half of his investment in the Residence (e.g., per Exhibit A, $517,824). Except for this limited right of contribution or credit, the equity in the real property and the residence constructed thereon shall constitute the Joint

Residence, and shall be community property. To the extend [sic] that Robert uses separate property funds to pay construction costs he shall not be reimbursed for such expenditures." (Italics added.)

The premarital agreement also states in paragraph 2 that: "It is the Parties' desire that the properties owned by each Party prior to marriage shall remain separate property and that the other shall acquire no interest in these properties by virtue of their marital relationship, except as expressly provided for in this Agreement. Thus, each Party preserves certain assets as his or her separate property to the exclusion of the other and waives certain property rights that he or she would or might acquire in the property of the other, and these benefits and waivers, along with the consideration in Sections 7 and 8 for the consideration for this Agreement."

The only exception regarding what property would be community property is set forth in paragraph 7.4.1, set forth *ante*, as "the real property described in Exhibit D (hereinafter the 'Residence' or 'Joint Residence')."

Paragraph 5.1.8 of the premarital agreement also states, in all capital letters: "IT IS THE INTENT OF THE PARTIES THAT ABSENT A SPECIFIC WRITTEN AGREEMENT NO COMMUNITY PROPERTY SHALL RESULT FROM THE MARRIAGE OF THE PARTIES. TO EMPHASIZE THE IMPORTANCE OF THIS ENTIRE SECTION 5.1 AND SUBPARTS THEREOF AND THIS SECTION 5.1.8, THE PARTIES SHALL INITIAL BELOW. FURTHER, BY INITIALLING, THE PARTIES ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED OF THEIR RIGHTS RELATING TO COMMUNITY PROPERTY, AND FULLY UNDERSTAND

5

THEIR RIGHTS, AND AGREE TO WAIVE THEIR COMMUNITY PROPERTY

RIGHTS."

Paragraph 14.4 states: "The Parties recognize the possibility that they may discuss from time to time the possibility of altering or amending the terms of this Agreement (*e.g.,* by acquiring jointly-owned property, or entering into a partnership or joint venture, *etc.*). It is specifically agreed that any statements made during those discussions, whether or not phrased in terms of promises, agreements, representations, or otherwise, shall not be binding, and shall be null and void, and of no force and effect, and shall be considered as discussions only, unless and until they are reduced to a written agreement signed by both Parties. [¶] The Parties recognize the possibility that each Party may, from time to time, act in such a way and engage in such conduct as to lead the other to believe that he or she intends to alter or amend the terms of this Agreement. It is specifically agreed that any such act or conduct by either Party shall not be binding, and shall be null and void, and of no force and effect, regardless of the inference drawn therefrom by the other Party, in the absence of a written agreement signed by both Parties setting forth the Parties' understanding."

Paragraph 14.3 states : "This Agreement may not be amended or terminated except by an in instrument in writing, signed by each of the Parties. No failure to exercise and no delay in exercising any right, remedy, or power under this Agreement shall operate as a waiver thereof. No modification, alteration, or waiver of any term, covenant, or condition of this Agreement shall be valid unless it is in writing and signed by each Party. The Parties understand that oral promises or promises inferred from

6

conduct, which would modify the terms of this Agreement, will not be binding on either Party. The Parties have been advised that they should obtain the advice of independent counsel prior to entering into any future agreement between them."

At the time the parties signed the premarital agreement, Robert had already entered into escrow to purchase the Rancho Santa Fe property through Anasazi Retreat, LLC, an entity formed by Robert for the purchase of that property.

B. *Events Occurring After Marriage and Prior to Separation*

As stated, *ante*, the parties married on July 30, 1999. The following month, on August 17, 1999, escrow closed on the Rancho Santa Fe property and the parties moved in and resided there during their marriage.

In 1999, Robert decided not to pursue developing the Tierra Del Sur property. Robert testified that he lost faith in his ability to develop the property, there were problems that came to his attention regarding a road that needed to be improved, the City of San Diego gave him a two-page document of requirements, and there was a wind problem. In March 2000, while married and living with Robert, Laura filed a lawsuit against him regarding the Tierra Del Sur property and recorded a lis pendens on the property. The lawsuit was ultimately dismissed by Laura on February 20, 2001, and the lis pendens was expunged.

On December 4, 2001, the Tierra Del Sur property was sold to the person from whom Robert had purchased the property for the same price he had paid for it. Prior to the property being sold, Laura was presented with an opportunity to purchase the

7

property on the terms detailed in the premarital agreement, but she chose not to exercise that option.

C. *Events Occurring After Separation*

On December 31, 2003, Robert filed for dissolution of marriage. Laura and Robert continued to reside at the Rancho Santa Fe property during the separation with Robert paying all of the expenses.

On December 1, 2006, the Rancho Santa Fe property was sold for $7.9 million. Laura subsequently claimed that that the Rancho Santa Fe property should be "substituted" for the Tierra Del Sur property.

D. *Motion for Summary Adjudication*

On September 28, 2009, Robert filed a motion for summary adjudication requesting "[t]hat the Court summarily adjudicate and find as follows: [¶] (1) That the residence [on] Camino Sierra del Sur in Rancho Santa Fe, California, also known as 'Rancho Santa Fe,' is not the joint residence of the parties, as described in paragraph 7.4.1 of the Parties' Premarital Agreement; and (2) That Respondent is entitled to no money or damages from the sale of the property located [on] Tierra Del Sur in San Diego, California, also known as 'Via Del Mar.'"

On December 4, 2009, the court (the Honorable Sim Von Kalinowski) denied Robert's motion, finding that "there are triable issues in this case, including, but not limited to, the issues of whether or not the Rancho Santa Fe home was a substitute property and whether or not there were damages for not developing the property at Tiare

8

[*sic*] Del Sur. *The Court further finds that parol evidence will need to be presented at the time of trial.*" (Italics added.)

E. *Motions In Limine*

On September 20, 2010, Laura served Robert with a list of exhibits she intended to introduce at trial, along with copies of the exhibits. Laura sought to introduce various correspondence relating to the negotiations and execution of the premarital agreement, as well as various drafts of the premarital agreement.

Thereafter, Robert filed a motion in limine which requested that the court (the Honorable Richard G. Cline, the matter having been reassigned for trial): (1) order Laura not to introduce into evidence any documents interpreting the parties' premarital agreement or concerning the parties' negotiation of it, including drafts of the agreement and letters relating to its negotiation and preparation; (2) order Laura, her counsel, and all witnesses to refrain from referring to those documents; (3) order Laura not to introduce into evidence any documents concerning a hypothetical residence; and (4) order Laura, her counsel, and all witnesses to refrain from referring to a hypothetical residence.

Laura opposed that motion and also filed a motion in limine, requesting: (1) an order declaring the language of paragraph 7.4.1 of the premarital agreement was uncertain, ambiguous and/or unclear as to the meaning and interpretation of its terms requiring the use of parol evidence (extrinsic evidence) to determine the meaning and interpretation of paragraph 7.4.1; (2) an order allowing Laura and Robert to introduce parol evidence, consisting of written documentation and/or witness testimony, to determine the meaning and interpretation of the terms of paragraph 7.4.1 of the

9

premarital agreement to conform to the intent and understanding of the parties; and (3) an order overruling or denying any objection to or motion in limine by Robert to preclude the use of parol evidence to determine the meaning and interpretation of paragraph 7.4.1 of the premarital agreement.

Specifically, Laura argued that paragraph 7.4.1 of the premarital agreement (1) should be interpreted to show that Robert was *obligated* to build a joint residence on the Via Del Mar property or, (2) alternatively, that paragraph 7.4.1 should be interpreted to mean that Robert was *obligated* to provide a substitute residence and that the substituted residence was the Rancho Santa Fe residence.

F. *Court's Ruling*

On January 10, 2011, the court granted Robert's motion in limine and denied Laura's. In doing so, the court found that the premarital agreement was fully integrated, not susceptible to the interpretation proposed by Laura, and was clear and unambiguous. The court found "[e]xtrinsic evidence is barred with regard to the intentions of the parties expressed in [paragraph] 7.4.1 of the prenuptial agreement. Further, [Robert's] Motion in Limine to exclude evidence of the 'Hypothetical Residence' is granted."

Trial was held in January 2011.

On January 25, 2011, the court granted Robert's motion for judgment pursuant to Code of Civil Procedure section 631.8 and found in favor of Robert and against Laura.

On March 1, 2011, the court issued a statement of decision making the following findings: "1. At relevant times, [Robert] never had a legal obligation to build a residence on the property located [on] Tierra Del Sur San Diego California. [¶] 2. At the relevant

10

times, [Robert] had no obligation to provide a substitute residence in lieu of the Tierra Del Sur residence. [¶] 3. [Laura] is not entitled to any funds from the sale of the Tierra Del Sur residence in light of her failure to exercise her right-of-first refusal. Further, [Robert] engaged in an arm's length transaction with the former owner of the property in connection with the sale by him of the Via Del Mar property. [¶] 4. The Rancho Santa Fe property is not a substitute residence for the joint residence set forth in paragraph 7.4.1 of the premarital agreement. [Laura] is not entitled to any share of the proceeds of that residence or any other alleged substitute residence. [¶] 5. All monies held in a trust in an account that [Robert] established per court order in this action are the property of and shall be released to [Robert]. [¶] 6. [Laura] has failed to establish her defenses to the petition. [¶] 7. [Robert] is entitled to judgment and to his costs as set forth."

On March 23, 2011, judgment was entered in Robert's favor consistent with the court's decision.

This timely appeal follows.

DISCUSSION

I. *STANDARD OF REVIEW*

The determination of whether the parol evidence rule applies so as to preclude extrinsic evidence concerning the mutual intention of the parties is a question of law subject to de novo review. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *Fischer v. First Internat. Bank* (2003) 109 Cal.App.4th 1433, 1443.)

11

# I. *ANALYSIS*

## A. *The Parol Evidence Rule*

The parol evidence rule is codified in Code of Civil Procedure section 1856 which provides that the "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."  Further, Civil Code section 1625 states that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

"Although the parol evidence rule results in the exclusion of evidence, it is not a rule of evidence but one of substantive law.  [Citation.]  It is founded on the principle that when the parties put all the terms of their agreement in writing, the writing itself becomes the agreement.  The written terms supersede statements made during the negotiations. Extrinsic evidence of the agreement's terms is thus *irrelevant,* and cannot be relied upon. [Citation.]  '[T]he parol evidence rule, unlike the statute of frauds, does not merely serve an evidentiary purpose; it determines the enforceable and incontrovertible terms of an integrated written agreement.  [Citations.]  The purpose of the rule is to ensure that the parties' final understanding, deliberately expressed in writing, is not subject to change." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174 (*Riverisland*).)

12

Application of the parol evidence rule involves a two-step analysis: (1) "[W]as the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements?" (2) "[I]s the agreement susceptible of the meaning contended for by the party offering the evidence?" (*Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270.)

B. *Integration*

Laura does not dispute that the marital settlement agreement is a fully integrated agreement. Therefore, we need only address the second step of the parol evidence analysis.

C. *The Court's Exclusion of Extrinsic Evidence*

Under the second step of our analysis we determine whether the extrinsic evidence offered by Laura serves to prove a meaning to which the language of the instrument is reasonably susceptible. However, in this case, Laura sought to introduce evidence that would *alter* the terms of paragraph 7.4.1 of the premarital agreement. Laura sought to change the word "intention" to "obligation." Laura also sought to insert a *new* clause in the agreement requiring Robert to provide a substitute residence. Therefore, the court properly excluded Laura's proffered extrinsic evidence.

"Under the parol evidence rule, extrinsic evidence is not admissible to contradict express terms in a written contract or to explain what the agreement was." (*Sunniland Fruit, Inc. v. Verni* (1991) 233 Cal.App.3d 892, 898.) "The agreement is the writing itself." (*Ibid*.) "Parol evidence cannot . . . be admitted to show intention independent of an unambiguous written instrument." (*Ibid.*)

13

Laura contends that the court should have admitted her parol evidence for the limited purpose of determining whether an ambiguity existed in the premarital agreement. However, the court found that the premarital agreement was completely integrated, unambiguous, and not reasonably susceptible to the interpretation proffered by Laura. Thus, the court was not required to admit Laura's parol evidence.

By way of example, in *Malstrom v. Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, the Court of Appeal held that when a contract was integrated and provided that it superseded all prior agreements, evidence of an implied agreement which contradicted the terms of the written agreement was not admissible, stating: "'[I]f the court decides in light of this extrinsic evidence that the contract is not reasonably susceptible to the offered interpretation, then the evidence is irrelevant and inadmissible to interpret the contract.'" (*Id*. at p. 316.)

Laura also asserts that the court erred in giving a "precatory" meaning to the word "intention," in paragraph 7.4.1 and should have looked at the entire clause of paragraph 7.4.1. However, the court did not just focus on the word "intention." Rather, in its statement of decision the court stated: "Following are some, but not all of the factors supporting the court's decision regarding interpretation of paragraph 7.4.1 of the premarital agreement. The separate property of each of the parties is clearly described in the agreement. This includes the Rancho Santa Fe property. Any claim of [Laura] to this property necessarily involves a transmutation. The contract includes a complete integration clause. The various obligations of the parties are clearly set forth in mandatory language. The disputed language in paragraph 7.4.1 clearly is not mandatory

14

in nature. The word 'intention' by definition does not connote an 'obligation.' The limitations on [Laura's] right to community property are clearly set out. Her right to a community property interest in Via Del Mar, on the other hand, is clearly spelled out and is limited. In several places the premarital agreement clearly specifies the limits upon transmutation of separate property into community property; transmutation cannot occur by acts [or] words alone; transmutation will occur only by a writing and only by the construction of a residence on the Via Del Mar property. *Use of the word 'intention' is consistent with* [*the*] *remainder of the sentence and the paragraph*: there is no obligation to build on Via Del Mar and other property is being considered for a residence. The paragraph contains an expression of current intention, not a future obligation." (Italics added.)

Laura's reliance on *Holmes v. Lerner* (1999) 74 Cal.App.4th 442 is also unavailing. *Holmes* dealt with the enforceability of an oral agreement, specifically an oral partnership agreement, not a fully integrated written agreement as we have in this case. Further, *Holmes* did not address intent, but an actual verbal agreement. As the Court of Appeal in *Holmes* stated: "Holmes was not seeking specific enforcement of a single vague term of the agreement. She was frozen out of the business altogether, and her agreement with Lerner was completely renounced. The agreement that was made and the subsequent acts of the parties supply sufficient certainty to determine the existence of a breach and a remedy." (*Id.* at p. 459, fn. omitted.)

Laura's reliance on *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793 also does not support her position. As Laura states in her opening brief, *Weddington*

15

merely stands for the proposition that an agreement is formed if the parties agreed on the "same thing in the same sense." (*Id.* at p. 811.) In this case the premarital agreement clearly states the parties' mutual intent.

The two other cases cited by Laura also do not support her position. Laura cites *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547 and *Magpali v. Farmers Group Inc.* (1996) 48 Cal.App.4th 471 for the proposition that "statements of intention to act . . . are in the nature of promises." However, in *Yield, supra,* 154 Cal.App.4th at page 575, the Court of Appeal stated that in order to prevail on a claim of *fraud*, a party has to "introduce evidence sufficient to persuade the trial court that at the time defendants entered into the asset transfer agreement, they lacked the intention to perform their undertakings." (See 5 Witkin, Summary of Cal. Law 10th ed. 2005) Torts, § 781, p. 1132 ["A declaration of intent, although in the nature of a promise, made in good faith, without intention to deceive, and in the honest expectation that it will be fulfilled, does not constitute fraud, even though it is not carried out."].) *Magpali, supra,* 48 Cal.App.4th at page 481 stands for the same proposition. However, in this case, the court found that Laura failed to establish her claim of fraudulent misrepresentation.

Laura next asserts that paragraph 7.4.1 is reasonably susceptible to the meaning she seeks to ascribe to it. In her opening brief, Laura recites all of the parol evidence she sought to admit in support of her position. However, this evidence is not admissible if the court has determined that the document at issue is fully integrated and not reasonably susceptible to the meaning offered by Laura, which is what the court found in this case.

16

Laura contends that the court did not comply with applicable "procedural mandates" in ruling on the motions in limine, which amounted to a "reconsideration" of Robert's motion for summary adjudication. However, Robert and *Laura* both filed motions in limine, placing the issue of admissibility of parol evidence before the court.

Moreover, as the California Supreme Court stated in *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1104-1105 (*Goel*), a restriction on a court's ability to sua sponte reconsider its own rulings "would directly and materially impair and defeat the court's most basic functions, exercising its discretion to rule upon controversies between the parties and ensuring the orderly administration of justice. Courts are empowered to decide controversies, a power derived from the state constitution. We are hard pressed to conceive of a restriction that goes more directly to the heart of a court's constitutionally mandated functions." Although the high court agreed there could be limits on a *party's* ability to file *repetitive* motions, it did not limit a court's ability to reconsider a prior ruling. (*Id.* at p. 1107.)

In *Goel*, the defendants moved for summary judgment. The court denied the motion, finding that the plaintiffs had raised a triable issue of fact. Thereafter, the defendants again moved for summary judgment on the same grounds. The motion was originally scheduled to be heard by the judge who had heard the first motion, but thereafter, was transferred to a second judge, who granted the motion. (*Goel, supra,* 35 Cal.4th at p. 1097.)

The plaintiffs appealed, asserting that the court's reconsideration of the motion for summary judgment was improper. The Court of Appeal affirmed, holding that the trial

17

court "had inherent power derived from the California Constitution to consider the second motion." (*Goel, supra,* 35 Cal.4th at p. 1096.) The California Supreme Court affirmed the Court of Appeal's decision, holding that while a *party* may not make renewed motions not based upon new facts or law, nothing "limit[s] a *court's* ability to reconsider its previous interim orders on it own motion, as long as it gives the parties notice that it may do so and a reasonable opportunity to litigate the question." (*Id.* at pp. 1096-1097.)

Laura's assertion that the trial court did not provide her with adequate notice and an opportunity to be heard is also misplaced. Laura herself filed a motion in limine putting the issue squarely before the court. In her motion in limine, Laura also asked that the trial court "consider all opposition pleadings, declarations and exhibits and legal authority filed by [Laura] in connection with the Motion for Summary Judgment as further support of [the] Motion in Limine." In addition, Laura filed a response to Robert's motion in limine on the same issue and addressed it in her reply memorandum of points and authorities.

Laura's argument that the motions in limine should have been heard by the judge who heard the motion for summary adjudication is also unavailing. The case was assigned to Judge Cline for trial. However, Laura did not request that the case be transferred back to the judge who denied the motion for summary in her motion in limine, or opposition to Robert's motion in limine. Rather, Laura did not make this request until *after* the trial court had ruled against her motion in limine. The fact that Laura did not object to Judge Cline hearing her motion until after Judge Cline ruled on her motion

18

prevents her from now arguing that the motion should have transferred back to the judge who had previously heard the motion for summary adjudication.

Laura also argues that Judge Cline was not allowed to "overrule" the decision of a different judge in the same case. However, Judge Cline was not ruling on another motion for summary adjudication, but on motions in limine that were presented to him by both parties. An order denying summary adjudication "simply establishes the existence of a triable fact when the order was made." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 10:364, p. 10:143.) It "does not establish the merits or legal sufficiency of either party's case. Thus, the judge at trial may direct a verdict in favor of the moving party despite the earlier denial of summary [adjudication]." (*Ibid*., italics omitted.)

In fact, in her motion in limine, counsel for Laura specifically requested that Judge Cline consider "all the opposition pleadings, declarations and exhibits and legal authority filed by [Laura] in connection with the Motion for Summary Judgment as further support of this Motion in Limine," thereby inviting Judge Cline to review Judge Von Kalinowski's ruling denying Robert's motion for summary judgment. Also, as noted by the court, Laura, by presenting Judge Cline with her motion in limine to introduce parol evidence, was estopped from requesting that the issue be referred back to Judge Von Kalinowski.[2]

---

[2] Although the court stated in its ruling that it could and would reconsider the ruling denying the motion for summary judgment, it only actually was presented with and ruled on the *motions in limine presented by both parties.* We express no opinion on when or

19

Laura's reliance on *In re Marriage of Herr* (2009) 174 Cal.App.4th 1463 is also unavailing. In *In re Marriage of Herr,* an untimely motion for reconsideration was filed after a two-day trial. The trial court, on its own motion, granted reconsideration and announced that all of the issues previously addressed during the trial would be revisited. (*Id.* at p. 1465.) The Court of Appeal held this amounted to a new trial which the court did not have authority to grant. (*Ibid.*)

*Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 372 also does not assist our analysis. There, the Court of Appeal held the trial court erred when it granted a motion for summary judgment when a different judge had previously denied the identical motion.

Here, the court did not rule on a motion for reconsideration or attempt to retry issues previously heard. It did not grant a request for summary judgment that had been previously denied. Rather, it only ruled on motions in limine regarding the issue of parol evidence that had been properly placed before it by *both* parties.

D. *Supplemental Briefing Re Fraud*

On February 22, 2013, we granted [Laura's] request to file a letter brief addressing the California Supreme Court's recent decision in *Riverisland, supra,* 55 Cal.4th 1169. At issue in *Riverisland* was the admissibility of parol evidence to prove fraud. (*Id.* at p. 1177.)

---

under what circumstances one judge may reconsider a ruling by another judge. (*Goel, supra,* 35 Cal.4th at p. 1097, fn. 2.)

20

In *Riverisland,* the plaintiffs alleged they negotiated an agreement to restructure their debt to a production credit association. They alleged that the representative of the credit association told them that their loan would be extended for two years in exchange for additional collateral consisting of two ranches. These assurances were repeated when they signed the restructuring agreement, which they signed where tabbed for their signatures without reading it. But the agreement actually provided for only three months forbearance and identified eight parcels as additional collateral. (*Riverisland, supra,* 55 Cal.4th at p. 1173.) The plaintiffs sued for fraud, negligent misrepresentation, rescission and reformation of the restructuring agreement. The trial court granted summary judgment on the ground that the fraud exception to the parol evidence rule did not allow admission of promises at odds with the terms of a written agreement. (*Ibid.*)

The Court of Appeal reversed, and the California Supreme Court affirmed, that decision. In doing so, the Supreme Court overruled *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258. *Pendergrass* had limited the fraud exception to the parol evidence rule by requiring that evidence offered to prove fraud "must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and *not a promise directly at variance with the promise of the writing.*" (*Id*. at p. 263, italics added.) Characterizing *Pendergrass* as "an aberration," the Supreme Court "reaffirm[ed] the venerable maxim stated in *Ferguson v. Koch* [(1928)] 204 Cal. [342,] 347: '[I]t was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud.'" (*Riverisland, supra,* 55 Cal.4th at p. 1182.)

21

However, in this case, both below and on appeal, [Laura] is *not* seeking to set aside the premarital agreement based upon fraud.  Rather, she seeks to introduce parol evidence to ascribe a meaning to paragraph 7.4.1 that is, as we have discussed, inconsistent with the plain and unambiguous language of the clause.   Thus, the *RiverIsland* case has no bearing on our resolution of this appeal.

DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

AARON, J.